NOT YET SCHEDULED FOR ORAL ARGUMENT

Nos. 26-7049, 26-7052, 26-7123, 26-7154

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

BARBARA J. LEE, ET AL.,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, ET AL.,

*Defendants-Appellants*,

On Appeal from the United States District Court
for the District of Columbia, 1:21-cv-00400-APM

**PRINCIPAL AND RESPONSE BRIEF OF APPELLEES**

PUBLIC COPY — SEALED MATERIAL DELETED

Edward G. Caspar
Jeffrey Blumberg
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street N.W., Suite 900
Washington, DC 20005
Tel: 202-662-8600
ecaspar@lawyerscommittee.org
jblumberg@lawyerscommittee.org

Faith E. Gay
Joshua S. Margolin
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
fgay@selendygay.com
jmargolin@selendygay.com

William J. Blechman
Elizabeth B. Honkonen
SPERLING KENNY NACHWALTER
Four Seasons Tower – Suite 1100
1441 Brickell Avenue
Miami, FL 33131
Tel: 305-373-1000
wblechman@sperlingkenny.com

*Attorneys for Plaintiffs Conrad Smith, et al.*

Joseph M. Sellers
Brian Corman
Alison S. Deich
Alisa Tiwari
Nina Jaffe-Geffner
COHEN MILSTEIN SELLERS & TOLL LLP
1100 New York Avenue N.W.
Eighth Floor Washington, D.C. 20005
Telephone: 202-408-4600
Facsimile: 202-408-4699
jsellers@cohenmilstein.com
bcorman@cohenmilstein.com
adeich@cohenmilstein.com
atiwari@cohenmilstein.com
njaffegeffner@cohenmilstein.com

Anthony P. Ashton
National Association for the Advancement of Colored People
Office of General Counsel
4805 Mount Hope Drive
Baltimore, MD 21215
Telephone: 410-580-5777
aashton@naacpnet.org

*Attorneys for Plaintiffs Barbara J. Lee, et al.*

Matthew Kaiser
Sarah R. Fink
KAISER PLLC
1099 Fourteenth Street N.W.
8th Floor Washington, D.C.
20005
Telephone: 202-640-2850
mkaiser@kaiserlaw.com
sfink@kaiserlaw.com

*Attorneys for Plaintiff Eric Swalwell*

Patrick A. Malone
Daniel Scialpi
PATRICK MALONE & ASSOCIATES, P.C.
1310 L Street N.W. Suite 800
Washington, D.C. 20005
Telephone: 202-742-1500
Facsimile: 202-742-1515
pmalone@patrickmalonelaw.com
dscialpi@patrickmalonelaw.com

Cameron Kistler
Kristy Parker
Erica Newland
UNITED TO PROTECT DEMOCRACY
2020 Pennsylvania Avenue N.W. #163
Washington, D.C. 20006
Telephone: 202-579-4582
cameron.kistler@protectdemocracy.org
kristy.parker@protectdemocracy.org
erica.newland@protectdemocracy.org

Genevieve C. Nadeau
UNITED TO PROTECT DEMOCRACY
15 Main Street, Suite 312
Watertown, MA 02472
Telephone: 202-579-4582
genevieve.nadeau@protectdemocracy.org

*Attorneys for Plaintiffs James Blassingame and Sidney Hemby*

Mark S. Zaid, Esq.
Bradley P. Moss, Esq.
MARK S. ZAID, P.C.
1250 Connecticut Avenue N.W.
Suite 700
Washington, D.C. 20036
Telephone: 202-498-0011
Facsimile: 202-330-5610
Mark@MarkZaid.com
Brad@MarkZaid.com

Matthew Kaiser
Sarah R. Fink
KAISER PLLC
1099 Fourteenth Street N.W. 8th
Floor Washington, D.C. 20005
Telephone: 202-640-2850
mkaiser@kaiserlaw.com
sfink@kaiserlaw.com

*Attorneys for Plaintiff Sandra Garza*

Patrick A. Malone
Daniel Scialpi
PATRICK MALONE & ASSOCIATES, P.C.
1310 L Street N.W. Suite 800
Washington, D.C. 20005
Telephone: 202-742-1500
Facsimile: 202-742-1515
pmalone@patrickmalonelaw.com
dscialpi@patrickmalonelaw.com

*Attorneys for Plaintiffs Marcus J. Moore et al.; Bobby Tabron et al.; and Briana Kirkland*

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

### I. Parties, Intervenors, Amici

Parties and Intervenors

All parties and intervenors appearing before the district court and in this Court are listed in the Briefs for Donald J. Trump and the United States.

Amici

The following amici have appeared in this appeal: the United States of America, State of West Virginia and States of Alabama, Florida, Idaho, Indiana, Iowa, Mississippi, Missouri, Montana, Nebraska, North Dakota, South Carolina, South Dakota, and Texas, and America First Legal Foundation.

Except for the following, all amici appearing before the district court are listed in the Brief for the United States:

Gregory P. Downs;

Laura F. Edwards;

Kate Masur; and

George A. Rutherglen.

The following amici previously appeared in prior appellate proceedings concerning the underlying matters before this Court: The United States of America, Evan H. Caminker, Vicki C. Jackson, Andrew Kent, Sheldon Nahmod, Daphna Renan, Peter M. Shane, Daniel B. Baer, James Arden Barnett, Jr., Paul L. Boyd, Steven A. Browning, Dwight L. Bush, Sr., Judith Cefkin, Akunna E. Cook, Greg Craig, Glyn T. Davies, Greg Delawie, William C. Eacho, John Feeley, Mark Feierstein, Robert S. Gelbard, Ken Gross, Keith M. Harper, Bruce Alan Heyman, Karl Hoffman, Vicki J. Huddleston, Dennis C. Jett, C. Donald Johnson, Laure E. Kennedy, Anthony Lake, Hugo Llorens, Carmen Lomellin, Lewis Lukens, David McKean, James D. Melville, Jr., Thomas Pickering, Steven Pifer, Randy Manner, Stephen D. Mull, Thomas B. Robertson, Theodore Sedgwick, Cliff Sloan, Alan D. Solomont, Karen Clark Stanton, M. Arsalan Suleman, Kevin Whitaker, Paula White, Donald B. Ayer, John B. Bellinger III, Matthew M. Collette, Charles Fried, Stuart M. Gerson, Mary B. McCord, David O'Neil, Alan Charles Raul, Matthew D. Roberts, Robert B. Shanks, Kate Shaw, Olivia Troye, and Jared Holt.

## II. Rulings Under Review

References to the rulings at issue appear in the Brief for Donald J. Trump.

## III. Related Cases

This Court consolidated this appeal with Case No. 26-7052, *Lee v. Trump* (D.C. Cir.); Case No. 26-7123, *Lee v. Trump* (D.C. Cir.); Case No. 26-7154, *Lee v. Trump* (D.C. Cir.); and with Case No. 26-8003, *In re: Donald J. Trump* (D.C. Cir.).

The cases on appeal were previously before this Court in *Blassingame v. Trump*, 22-5069; *Swalwell v. Trump*, 22-7030; *Thompson v. Trump*, 22-7031; *Moore v. Trump*, 22-7120; *Tabron v. Trump*, 22-7121; *Kirkland v. Trump*, 22-7122; and *Smith v. Trump*, 23-7010.

# TABLE OF CONTENTS

Page

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES ..... iv

I. Parties, Intervenors, Amici ..... iv

II. Rulings Under Review ..... vi

III. Related Cases ..... vi

TABLE OF AUTHORITIES ..... ix

GLOSSARY ..... xv

INTRODUCTION ..... 1

STATEMENT OF JURISDICTION ..... 3

STATEMENT OF ISSUES ..... 3

STATEMENT OF THE CASE ..... 4

I. Trump repeatedly claimed election fraud to remain in office. 5

II. Private actors organized the January 6, 2021 Rally to prevent certification of his election loss. ..... 6

III. At the Rally, Trump encouraged supporters to disrupt the certification. ..... 8

IV. Trump supported rioters after the Rally. ..... 9

V. Plaintiffs filed claims against Trump and others. ..... 10

SUMMARY OF THE ARGUMENT ..... 13

STANDARD OF REVIEW ..... 20

ARGUMENT ..... 21

I. Trump failed to meet his burden of establishing that he is entitled to presidential immunity. ..... 21

A. *Blassingame* provides, and the district court applied, the governing standard. 21

B. Trump failed to show his Rally Speech was official. 31

C. Trump fails to show his other actions were official. 54

D. The district court erred in granting summary judgment as to Trump's 2:24 p.m. tweet. 67

II. The district court correctly struck the Government's Westfall Act Certification. 77

A. The district court correctly applied D.C. respondeat superior law. 78

B. Each element of the scope-of-employment test independently defeats certification. 83

III. The district court correctly denied Trump's motion to dismiss on First Amendment grounds. 88

CONCLUSION 109

CERTIFICATE OF COMPLIANCE 114

CERTIFICATE OF SERVICE 115

## TABLE OF AUTHORITIES[1]

**Page(s)**

**Cases**

*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*,
121 F.4th 1314 (D.C. Cir. 2024) .......... 30

*Anderson v. Griswold*,
543 P.3d 283 (Colo. 2023) .......... 50, 103

*Bahlul v. United States*,
77 F.4th 918 (D.C. Cir. 2023) .......... 30

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 97

*Bible Believers v. Wayne County*,
805 F.3d 228 (6th Cir. 2015) (en banc) .......... 94

*Bilek v. Fed. Ins. Co.*,
8 F.4th 581 (7th Cir. 2021) .......... 105

**Blassingame v. Trump*,
87 F.4th 1 (D.C. Cir. 2023) .... 1, 11, 13, 14, 15, 17, 21, 22, 24, 25, 26, 28, 29, 30, 31, 34, 35, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 51, 55, 57, 59, 60, 74, 76, 80, 82, 83, 86, 88

*Bombardier Corp. v. Nat'l R.R. Passenger Corp.*,
333 F.3d 250 (D.C. Cir. 2003) .......... 20

**Brandenburg v. Ohio*,
395 U.S. 444 (1969) .......... 18, 89, 90, 92, 93, 97, 98, 102

*Carroll v. Trump*,
49 F.4th 759 (2d Cir. 2022) .......... 83

---

[1] Authorities upon which we chiefly rely are marked with asterisks.

*Carroll v. Trump*,
88 F.4th 418 (2d Cir. 2023) .......... 83

*Clinton v. Jones*,
520 U.S. 681 (1997) .......... 21, 76

*Consolidated Edison Co. of N.Y., Inc. v. FERC*,
510 F.3d 333 (D.C. Cir. 2007) .......... 58

*Council on Am.-Islamic Rels. v. Ballenger*,
444 F.3d 659 (D.C. Cir. 2006) .......... 84

*Counterman v. Colorado*,
600 U.S. 66 (2023) .......... 93, 101, 102

*Cruz v. Am. Airlines, Inc.*,
356 F.3d 320 (D.C. Cir. 2004) .......... 66

*Defs. of Wildlife v. Gutierrez*,
532 F.3d 913 (D.C. Cir. 2008) .......... 20

*Dennis v. United States*,
341 U.S. 494 (1951) .......... 89

*District of Columbia v. Air Florida, Inc.*,
750 F.2d 1077 (D.C. Cir. 1984) .......... 48

*Federal Election Commission v. Wisconsin Right to Life, Inc.*,
551 U.S. 449 (2007) .......... 19, 20, 90, 103, 104

*Goland v. Cent. Intel. Agency*,
607 F.2d 367 (D.C. Cir. 1978) .......... 44

*Grimes v. District of Columbia*,
794 F.3d 83 (D.C. Cir. 2015) .......... 70

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) .......... 107

*Herceg v. Hustler Mag., Inc.*,
814 F.2d 1017 (5th Cir. 1987) .................................................... 89

*Hess v. Indiana*
414 U.S. 105 (1973) ..................................................................... 99

*Hood River Distillers, Inc. v. Nat'l Lab. Rels. Bd.*,
130 F.4th 204 (D.C. Cir. 2025) ................................................ 103

*Howard Univ. v. Best*,
484 A.2d 958 (D.C. 1984) ........................................................... 81

*Johnson v. Weinberg*,
434 A.2d 404 (D.C. 1981) ........................................................... 81

*Keepseagle v. Perdue*,
856 F.3d 1039 (D.C. Cir. 2017) ......................................... 66, 103

*Kimbro v. Velten*,
30 F.3d 1501 (D.C. Cir. 1994) .................................................... 79

*Kingsley v. Hendrickson*,
576 U.S. 389 (2015) ............................................................. 49, 50

*LaShawn A. v. Barry*,
87 F.3d 1389 (D.C. Cir. 1996) .................................................... 21

*Lindke v. Freed*,
601 U.S. 187 (2024) ........................................................16, 58, 59

*Lyon v. Carey*,
533 F.2d 649 (D.C. Cir. 1976) .................................................... 81

*Majano v. United States*,
469 F.3d 138 (D.C. Cir. 2006) .................................................... 87

*McBride v. Merrell Dow & Pharms., Inc.*,
800 F.2d 1208 (D.C. Cir. 1986) ............................................ 16, 68

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982) .............................. 18, 19, 20, 97, 98, 106, 107

*Nat'l R.R. Passenger Corp. v. ExpressTrak, LLC*,
330 F.3d 523 (D.C. Cir. 2003) .......................................................... 3

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982) .......................................................... 22

*Noto v. United States*,
367 U.S. 290 (1961) .......................................................... 91

*Nwanguma v. Trump*,
903 F.3d 604 (6th Cir. 2018) ..........................................19, 93, 94

*Phillips v. Mabus*,
894 F. Supp. 2d 71 (D.D.C. 2012) .......................................... 78

*Planned Parenthood of the Columbia / Willamette, Inc. v. Am. Coal. of Life Activists*,
290 F.3d 1058 (9th Cir. 2002) .......................................... 107

*Rasul v. Myers*,
512 F.3d 644 (D.C. Cir. 2008) .......................................... 85

*Robbins v. District of Columbia*,
650 F. App'x 37 (D.C. Cir. 2016) .......................................... 69

*Saxe v. State Coll. Area Sch. Dist.*,
240 F.3d 200 (3d Cir. 2001).......................................... 107

*Schenck v. United States*,
249 U.S. 47 (1919) .......................................................... 90

*Sherwood v. Wash. Post*,
871 F.2d 1144 (D.C. Cir. 1989) .......................................... 68

*Snyder v. Phelps*,
562 U.S. 443 (2011) .......................................................... 28

*Solomon v. Vilsack*,
763 F.3d 1 (D.C. Cir. 2014) .......................................................... 66

*State v. Meadows*,
88 F.4th 1331 (11th Cir. 2023) .................... 63

*Stewart v. Credit Bureau*,
734 F.2d 47 (D.C. Cir. 1984) .................... 68

*Sussman v. U.S. Marshals Serv.*,
494 F.3d 1106 (D.C. Cir. 2007) .................... 69

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) .................... 105

*Texas v. Johnson*,
491 U.S. 397 (1989) .................... 93

*United States ex rel. Totten v. Bombardier Corp.*,
380 F.3d 488 (D.C. Cir. 2004) .................... 88

**Trump v. Carroll*,
292 A.3d 220 (D.C. 2023) .................... 17, 79, 80, 82, 83, 84, 86, 88

*Tuckson v. United States*,
77 A.3d 357 (D.C. 2013) .................... 55

*United States v. McDermott*,
29 F.3d 404 (8th Cir. 1994) .................... 108

**United States v. Trump*,
603 U.S. 593 (2024) .. 14, 15, 21, 26, 27, 28, 29, 30, 40, 42, 43, 49, 57, 58, 59, 62, 72, 74

*United States v. White*,
610 F.3d 956 (7th Cir. 2010) .................... 102

*Wilson v. Libby*,
535 F.3d 697 (D.C. Cir. 2008) .................... 85

*Wisconsin v. Mitchell*,
508 U.S. 476 (1993) .................... 106

*Wuterich v. Murtha*,
562 F.3d 375 (D.C. Cir. 2009) ........................................17, 21, 85

**Constitutional Provisions**

Article II..............................................................14, 40, 70

First Amendment...1, 10, 11, 12, 13, 16, 64, 65, 66, 88, 103, 106, 109

**Statutes**

28 U.S.C. § 1292(b) ................................................................ 3

28 U.S.C. § 1331...................................................................... 3

28 U.S.C. § 2679(d) ............................................................... 11

**Rule**

Fed. R. Civ. P. 12(b)(6)........................................................ 105

Fed. R. Civ. P. 56(a) ............................................................... 70

Fed. R. Civ. P. 56(c)(1)(A) ...................................................... 71

Fed. R. Civ. P. 56(c)(2) ........................................................... 47

Fed. R. Civ. P. 56(f)........................................................... 16, 68

**Other Authorities**

6 Op. O.L.C. 214 (1982) ......................................................... 23

John Stuart Mill, *On Liberty* 100-01 (London, John W.
Parker & Son, 2d ed. 1859) ..................................................... 91

## GLOSSARY

| | |
|---|---|
| AOB | Defendant-Appellant Trump's Opening Brief |
| GOB | United States' Opening Brief |
| SAB | States' Amicus Brief |
| SUF | Trump's Counterstatement to Plaintiffs' Statement of Additional Undisputed Facts, *Lee v. Trump*, No. 21-cv-00400, Dkt. 175-2 |
| CSUF | Trump's Response to Plaintiffs' Counterstatement to Trump's Statement of Undisputed Facts, *Lee v. Trump*, No. 21-cv-00400, Dkt. 175-1 |
| Table B | Table located in CSUF ¶ 29 |
| Table C | Table located in CSUF ¶ 30 |
| Table D | Table located in CSUF ¶ 31 |
| Table E | Table located in CSUF ¶ 38 |
| *Lee* | *Lee v. Trump*, No. 21-cv-00400 |
| Op. | *Lee v. Trump*, No. 21-cv-00400, Dkt. 219 |
| *Lee* Compl. | *Lee v. Trump*, No. 21-cv-00400, Dkt. 11-1 |
| *Smith* | *Smith v. Trump*, No. 21-cv-02265 |
| *Smith* Compl. | *Smith v. Trump*, No. 21-cv-02265, Dkt. 89 |
| *Moore* Compl. | *Moore v. Trump*, No. 22-cv-00010, Dkt. 1 |
| *Swalwell* | *Swalwell v. Trump*, No. 21-cv-00586 |
| *Swalwell* Compl. | *Swalwell v. Trump*, No. 21-cv-00586, Dkt. 1 |

| | |
|---|---|
| *Blassingame* | *Blassingame v. Trump*, No. 21-cv-00858 |
| *Blassingame* Compl. | *Blassingame v. Trump*, No. 21-cv-00858, Dkt. 3 |
| *Tabron* Compl. | *Tabron v. Trump*, No. 22-cv-00011, Dkt. 1 |
| *Kirkland* Compl. | *Kirkland v. Trump*, No. 22-cv-00034, Dkt. 1 |
| *Garza* Compl. | *Garza v. Trump*, No. 23-cv-00038, Dkt. 35-3 |

## INTRODUCTION

After losing the 2020 election, Defendant Donald J. Trump embarked on a scheme to retain the presidency. His actions culminated in a speech to a crowd of thousands at a rally on January 6, 2021, which was organized, funded, promoted, and executed by private individuals and organizations affiliated with his campaign and the campaign itself. His speech incited rallygoers to invade the Capitol, violently disrupt the peaceful transfer of power, and inflict grave harm on Plaintiffs, who brought these lawsuits to hold Trump and his co-conspirators accountable.

Below, Trump and the Government sought to shield Trump from liability by invoking presidential immunity, Westfall Act certification, and the First Amendment. The district court denied Trump's motions and the Government's certification in a decision that scrupulously applied the standards that this Court articulated in *Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023), District of Columbia respondeat superior law, and Supreme Court precedent governing incitement. The district court made an error, however, in holding that Trump was entitled to presidential immunity for a

tweet he issued after the January 6 speech, at 2:24 p.m. The district court did so even though Trump had not moved for summary judgment or presented an argument supporting immunity for that tweet. On appeal, Trump and the Government ask the Court to vacate a prior panel's decision from this Court, ignore binding precedent, and find Trump blameless—and indeed, acting within the scope of his duties as President—for leading an assault on our nation's democracy designed to retain his own grasp on power.

The Court should reject Trump's arguments and largely affirm the district court's ruling. *First*, the district court rightly held that Trump failed to carry his burden to establish that he is entitled to summary judgment on presidential immunity. But the district court erred in granting immunity as to a single tweet for which Trump made no effort to carry his burden. *Second*, the district court correctly struck the Westfall Act certification because Trump's conduct was not within the scope of his official duties. *Finally*, the district court correctly held that Plaintiffs have plausibly alleged that Trump's speech incited imminent violence. And even if Trump's speech wasn't incitement, dismissal is not the appropriate remedy.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. This Court has pendent jurisdiction over Plaintiffs' cross-appeal. "[S]ubstantial considerations of fairness or efficiency demand" it, because the district court's grant of immunity as to the 2:24 p.m. tweet "is 'inextricably intertwined' with an appealable order." *Nat'l R.R. Passenger Corp. v. ExpressTrak, LLC*, 330 F.3d 523, 527 (D.C. Cir. 2003). Additionally, the district court granted Plaintiffs' request to certify the ruling under 28 U.S.C. § 1292(b) on July 22, 2026, and this Court consolidated the appeal on July 30, 2026.

## STATEMENT OF ISSUES

**1.** Whether Trump carried his burden under *Blassingame* to demonstrate that he is entitled to summary judgment on presidential immunity for his January 6, 2021 rally speech (the "Rally Speech").[2]

[2] Trump's statement of issues concerns only the Rally Speech, not any of his prior or subsequent conduct at issue.

**2.** Whether Trump carried his burden of demonstrating that he is entitled to summary judgment on presidential immunity for a 2:24 p.m. tweet.

**3.** Whether the Government's Westfall Act certification should be struck because Trump acted outside the scope of his employment as to Plaintiffs' state- and common-law claims.

**4.** Whether the district court correctly held that, after months of telling his supporters that the election was stolen from them, encouraging them to engage in violence, summoning them to Washington on the day the 2020 election was to be certified, and deploying them to the Capitol, Plaintiffs plausibly alleged that Trump's Rally Speech was incitement.

## STATEMENT OF THE CASE

Plaintiffs are Capitol Police officers and members of Congress who were at the Capitol on January 6, 2021. Plaintiffs assert several claims based on allegations that Trump conspired and otherwise attempted to prevent Congress from certifying the results of the November 2020 presidential election through force, intimidation, and threats. *See generally, e.g.*, *Smith* Compl.

## I. Trump repeatedly claimed election fraud to remain in office.

Months before the 2020 election, Trump repeatedly claimed that he could lose the election only if it were "rigged" and "FRAUDULENT," including on his personal Twitter account, @realDonaldTrump. SUF ¶¶ 21-25. After he lost, Trump claimed that victory was "stolen" from him (*id.* ¶ 243), and that he had "won in a LANDSLIDE" (*id.* ¶ 39; *see also id.* ¶¶ 26-38, 40-42, 45-50, 244), despite multiple courts and his own Attorney General publicly acknowledging they had found no credible evidence of outcome-determinative election fraud (*see, e.g., id.* ¶¶ 102-17).

Trump's false election-fraud claims were part of a broader, multi-faceted attempt to remain in office. In late 2020, Trump pressured Republican officials in key swing states to change their states' certified results based on meritless claims of election fraud. *Id.* ¶¶ 75-84, 86-95. Trump, his Campaign[3] affiliates, and others also enlisted individuals in key swing states to cast fraudulent electoral

[3] "Campaign" collectively refers to Donald J. Trump for President, Inc. ("DJTFP") and Make America Great Again PAC ("MAGA PAC"). SUF ¶¶ 7-9.

votes for Trump. *Id.* ¶¶ 51-74. Additionally, Trump and his Campaign pursued meritless claims of election fraud in court, bringing five lawsuits in Trump's personal capacity as a candidate for reelection. *Id.* ¶¶ 103-04, 107. None were successful. *Id.* ¶¶ 73, 102, 105-06, 108.

## II. Private actors organized the January 6, 2021 Rally to prevent certification of his election loss.

On January 6, 2021, a joint session of Congress was scheduled to certify the Electoral College's vote. *Id.* ¶¶ 51-55. Out of other options to alter the election results, Trump, his Campaign and affiliates, and other private individuals dedicated to keeping Trump in office privately planned, funded, and organized a "Save America Rally" for that morning at the Ellipse in Washington, D.C. *Id.* ¶¶ 118-26; Tables C, D, E.

A private political organization, Women for America First ("WFAF"), obtained the Rally permit, which described the event as a "March for Trump." SUF ¶¶ 123-30, 180-85, 210-20. Ten of the twelve people named in the Rally permit had worked for the

Campaign. *Id.* ¶¶ 186-202; Table C. No government employees were identified on the permit. *Id.* ¶¶ 186-202; Table C.

Campaign affiliates and other private actors—not government employees—organized and executed the Rally. WFAF worked with numerous Campaign affiliates to plan the event. SUF ¶¶ 120, 123-33, 145-57, 161-66, 170-74, 176, 180-87, 191, 195-97, 263-70; Table D. Individuals who were or had been recently employed by the Campaign coordinated Rally logistics (*e.g.*, transportation and event planning services), including by using their Campaign email addresses. SUF ¶¶ 139-43, 152-57, 161-76, 196, 204, 252, 256-57, 263, 265-66, 268; Table E. Katrina Pierson—who served as Senior Campaign Advisor as recently as December 31, 2020—met with Trump to select the Rally speakers. SUF ¶¶ 128, 145, 148-51, 263-70. Pierson and other Campaign affiliates helped select the final list of speakers, several of whom were associated with the Campaign and received payment from Campaign-affiliated funds. *Id.* ¶¶ 145-57, 180, 257, 263-70. Aside from Trump, no executive branch employee spoke at the Rally. *Id.* ¶¶ 136-37, 271-86.

The Rally was funded entirely by private donations, and the Campaign and its affiliates financially supported the Rally. *Id.* ¶¶ 203, 312-13. For example, the Rally's expenses were underwritten principally by a Campaign donor whose contribution was secured by a Campaign finance advisor, and the Campaign directly paid for some of the Rally's expenses and compensated some organizers for their work in connection with the Rally. *Id.* ¶¶ 134-35, 139-43, 152-57, 161-63, 177-79, 195-97, 204-09, 211, 215-17.

Promotion was exclusively private: The Campaign's social-media accounts promoted the event, and Trump promoted it on @realDonaldTrump. *Id.* ¶¶ 221-50. The official @POTUS and @WhiteHouse accounts and the White House website never mentioned the Rally. *Id.* ¶¶ 251, 323-28.

## III. At the Rally, Trump encouraged supporters to disrupt the certification.

At the Rally, Trump spoke before a crowd of thousands of private individuals, moments before the election was to be certified, insisting again that the election in which he was a candidate was "stolen" and encouraging the crowd to "never concede." *Id.* ¶¶ 122,

335, 337. He claimed that election fraud occurred in six states he lost; told the audience that Vice President Mike Pence must "do the right thing" by delaying the certification so that "we win the election"; and told the crowd to "fight like hell" and to "walk" to the U.S. Capitol to "take back our country." *Id.* ¶¶ 336-39. There is no evidence that Pence or any members of Congress were present at the Rally or were otherwise listening to Trump's speech.

White House staff treated the speech as political. The speechwriters who worked for both the White House and the Campaign drafted it using tools they "generally" reserved for political speeches. *Id.* ¶¶ 300-03. The White House later designated a transcript of Trump's speech as political (not official). *Id.* ¶¶ 303, 346.

## IV. Trump supported rioters after the Rally.

At approximately 2:13 p.m., rioters breached the Capitol. *Id.* ¶ 348. Shortly before, @realDonaldTrump tweeted a video of his speech. *Id.* ¶ 347. The official @POTUS and @WhiteHouse Twitter accounts and the official White House website didn't post the speech. *Id.* ¶¶ 323-28. At 2:24 p.m., as the Secret Service evacuated Pence

and rioters chanted "Hang Mike Pence," Trump tweeted: "Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution." *Id.* ¶¶ 348-49.

At approximately 4:17 p.m., Trump released a video telling the rioters to "go home," while repeating that the election "was stolen from us," and telling them: "We love you, you're very special." *Id.* ¶ 350.

## V. Plaintiffs filed claims against Trump and others.

The first of Plaintiffs' complaints was filed on February 16, 2021. *Lee*, Dkt. 1. Trump moved to dismiss in May 2021, asserting, *inter alia*, presidential immunity and protection under the First Amendment. *Lee*, Dkt. 22-1. In February 2022, the district court denied Trump's motion, rejecting Trump's presidential-immunity arguments. *See Blassingame*, Dkt. 37 at 23-40. The district court also rejected Trump's First Amendment argument. *Id.* at 80-98. Trump appealed only the district court's denial of his immunity defense. *Blassingame*, Dkt. 39. This Court affirmed that Trump was not entitled to immunity based on the allegations in the complaints

and remanded to allow Trump to develop evidence that would support his immunity defense. *Blassingame*, 87 F.4th at 29-30.

Trump then moved for summary judgment in January 2025, and Plaintiffs opposed. *Lee*, Dkts. 144-1, 155-1. Trump also moved for reconsideration of the district court's First Amendment ruling, which Plaintiffs also opposed. *Lee*, Dkts. 145, 154. And the Government filed Notices of Substitution under the Westfall Act, 28 U.S.C. § 2679(d), which Plaintiffs moved to strike. *Smith*, Dkt. 376; *Lee*, Dkt. 183.

On March 31, 2026, the district court resolved the motions. Op. It held that, under *Blassingame*, Trump failed to carry his burden of proof for summary judgment on presidential immunity on nearly all of the conduct at issue, including: (1) his Rally Speech; (2) his outreach to state and local officials, with the exception of a single meeting; (3) all but two of his challenged tweets; (4) his statements during Campaign rallies and other political events; (5) the Campaign's statements, tweets, and other social-media posts; (6) his and the Campaign's lawsuits challenging "various States' election

results"; and (7) his role in "the so-called 'false-elector scheme.'" *Id.* at 4-58.

The district court also denied Trump's motion to reconsider its First Amendment ruling, reaffirming that the Rally Speech plausibly constituted incitement, but certified that issue for interlocutory review. *Id.* at 58-69, 76.

Finally, the district court granted Plaintiffs' motion to strike the Government's Westfall Act certification, holding that "the same activities found to be beyond the outer perimeter of President Trump's official responsibilities also fall outside the scope of his employment as President of the United States" under District of Columbia respondeat superior law. *Id.* at 72; *see also id.* at 70-71, 73-76.

Trump appealed from the denial of summary judgment, and the Government appealed the order striking its Westfall Act certification. After this Court granted Trump's petition for permission to appeal the certified First Amendment question, that appeal was consolidated with the earlier appeals under No. 26-7049. Plaintiffs sought reconsideration of the district court's grant of

summary judgment on Trump's 2:24 p.m. January 6, 2021 tweet, which the district court denied and certified for interlocutory review. *Lee*, Dkts. 228, 253. Plaintiffs then cross-appealed as to the 2:24 p.m. tweet (*Lee*, Dkt. 254), and that appeal was also consolidated under No. 26-7049.

## SUMMARY OF THE ARGUMENT

This Court should affirm the denial of immunity, the order striking the Government's Westfall Act certification, and the First Amendment ruling, and should reverse the grant of immunity for Trump's 2:24 p.m. tweet.

**I.** Trump didn't carry his burden of establishing presidential immunity.

**A.** Under *Blassingame*, which supplies the governing standard, immunity attaches to presidential actions only if an "objective, context-specific assessment" shows those actions are within the outer perimeter of the President's responsibilities. 87 F.4th at 21. The key question is whether conduct is "clothed in the trappings of an official function" or "bears the hallmarks of re-election campaign activity." *Id.* at 21; *see also id.* at 22-23, 30.

Conduct that "may reasonably be understood only as re-election campaign activity" is not immune. *Id*. at 21-22, 30. *United States v. Trump*, 603 U.S. 593, 629-30 (2024), reinforced that framework, citing *Blassingame* approvingly and calling for the same "factbound analysis" of the Rally Speech's "content and context."

**B.** Under that standard, the Rally Speech was the act of an office-seeker. The objective indicia point the same way. Trump spoke at a political rally funded, promoted, and organized by a private political organization, and staffed by former Campaign personnel, with input from Trump provided through a senior Campaign advisor. The Rally Speech's content—"we win the election," "never concede"—confirms Trump's office-seeking behavior. *See Blassingame*, 87 F.4th at 17.

Trump's and the Government's efforts to avoid *Blassingame*'s contextual analysis fail. Trump's Recommendations Clause argument recasts the Take Care Clause argument this Court rejected in *Blassingame*: invoking an Article II power, "without more, assumes the answer" to whether he acted as office-holder or office-seeker. 87 F.4th at 24. His "bully pulpit" theory fares no

better, because this Court and the Supreme Court have made clear that presidential speech is not immunized simply because it is on a matter of public concern. *Id.* at 14-16; *Trump*, 603 U.S. at 629-30. *Blassingame* doesn't require that an event be fully run by a formal campaign to be political in nature, and the Campaign's role in paying for, promoting, and organizing the Rally is undisputed in any event. Trump's new "knowability" theory—that he's entitled to immunity unless he knew of the complete context confirming its unofficial nature—was never raised below, is forfeited, is foreclosed by *Blassingame*'s objective inquiry, and cannot be squared with the record. The "official trappings" inquiry Trump attacks as unsupported comes from this Court's *Blassingame* decision. Finally, the Government's charge that the district court improperly probed Trump's motives lacks record support.

**C.** Trump likewise failed to show that his other challenged conduct was official. He doesn't defend most of it on appeal (forfeiting his ability to challenge that ruling). For the two tweets and one Campaign statement he does address, he fails to provide the tweet-specific evidence of "content and context" that *Trump* and

*Lindke v. Freed*, 601 U.S. 187, 197-204 (2024), require. The undisputed context and content show that Trump was acting as an office-seeker. And Trump's assertion that Plaintiffs conceded First Amendment arguments about his pre-Rally speech is both false and outside the First Amendment question before this Court.

**D.** On Plaintiffs' cross-appeal, the district court erred in granting immunity for the 2:24 p.m. tweet. Trump never sought summary judgment on that tweet, and the court granted it *sua sponte* on facts outside the parties' statements, without the notice Rule 56(f) requires. *McBride v. Merrell Dow & Pharms., Inc.*, 800 F.2d 1208, 1211-12 (D.C. Cir. 1986). On the merits, Trump offered no contextual evidence—an omission the district court treated as dispositive for every other tweet. The record shows him away from his staff, on the phone with his personal lawyer and congressional allies, and posting from his personal account a message faulting Pence for lacking "the courage" to secure his reelection. The tweet is indistinguishable from other tweets for which the district court denied summary judgment.

**II.** The district court correctly struck the Government's Westfall Act certification.

**A.** District of Columbia respondeat superior law governs, *Wuterich v. Murtha*, 562 F.3d 375, 383 (D.C. Cir. 2009), and it requires a nexus between the tortious conduct and the employee's responsibilities. Because an incumbent's interest in reelection is "purely private," *Blassingame*, 87 F.4th at 17, campaigning to retain office is not what a President is employed to do. The district court did not hold that immunity and Westfall inquiries are always coextensive; it held that, on this record, there is no daylight between them.

**B.** Each respondeat superior element independently defeats certification: The conduct was not of the kind Trump was employed to perform; a President who is "always on duty" is not acting within the scope of his employment when "attending to personal business," *Trump v. Carroll*, 292 A.3d 220, 233 (D.C. 2023); the conduct was actuated by his personal interest in retaining office; and the Government does not contest that Trump's encouragement of force against a coordinate branch was unexpectable.

**III.** The district court correctly held that Plaintiffs plausibly alleged that the Rally Speech was unprotected incitement. Trump's three reasons for reversal—that incitement must be explicit, that context is irrelevant, and that an unrelated campaign-finance case requires dismissal—fail. And, even if the Rally Speech were protected, dismissal would not follow.

**A.** Proof of incitement has always turned on context. *Brandenburg*'s elements—that speech is directed to and likely to produce imminent lawless action—cannot be judged from words in isolation. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). Thus, the district court correctly started, but did not stop, with Trump's words. Rather, it read those words against the complaints' allegations: months of stolen-election claims, a crowd containing organized militia groups, and chants of "storm the Capitol" as Trump sent the crowd to the certification. On those allegations, it is plausible that Trump's words were likely to produce imminent lawless action and that he intended that result.

Trump's proposed explicitness rule has no footing in precedent. *Claiborne Hardware* holds that statements that "implicitly

conveyed" a stern message may constitute incitement. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 927 (1982). Trump's own lead authority recognizes that implicit encouragement of violence can qualify. *Nwanguma v. Trump*, 903 F.3d 604, 609 (6th Cir. 2018).

Moreover, contrary to Trump's assertions, the complaints allege far more than his awareness that the crowd might turn violent: Trump ratified violence at earlier protests, insisted on an unpermitted march to the certification, urged the removal of metal detectors so people with AR-15s could join, and stated that rioters wanted what he wanted when they breached the Capitol. And he did so while repeating an election-theft story that courts had rejected and that state-election officials and his own Attorney General had publicly disputed. *See* SUF ¶¶ 98-102, 105, 112-14.

**B.** Trump's argument relying on *Federal Election Commission v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007) ("*WRTL*"), is forfeited, waived, and wrong. Trump cited *WRTL* only in passing below and intentionally relinquished the argument by building his defense on *Brandenburg*'s intent requirement. On the merits, *WRTL*'s test is, by its own terms, "only triggered if the speech meets

the bright-line requirements" of a campaign-finance statute, and does not apply to incitement cases. 551 U.S. at 474 n.7.

**C.** Even if the Rally Speech were protected, dismissal would be improper. A speaker who "authorized, directed, or ratified" unlawful activity may be held responsible for its consequences, and protected speech may be used to corroborate other evidence that a speaker authorized or ratified violence. *Claiborne Hardware*, 458 U.S. at 927, 929. Plaintiffs' claims are independently supported by a pattern of conduct outside of the Speech, and the Speech may corroborate that evidence. To obtain dismissal, Trump must show both that the Speech was protected and that this protection leaves each claim inadequately pleaded. He has shown neither.

## STANDARD OF REVIEW

A district court's rulings on motions to dismiss and for summary judgment are subject to de novo review. *See Defs. of Wildlife v. Gutierrez*, 532 F.3d 913, 918 (D.C. Cir. 2008); *Bombardier Corp. v. Nat'l R.R. Passenger Corp.*, 333 F.3d 250, 252 (D.C. Cir. 2003).

A district court's legal conclusions in denying Westfall Act certification are also subject to de novo review, but appellate courts "must accept [plaintiffs'] factual allegations as true and construe the complaint liberally in [their] favor." *Wuterich*, 562 F.3d at 383.

## ARGUMENT

### I. Trump failed to meet his burden of establishing that he is entitled to presidential immunity.

#### A. *Blassingame* provides, and the district court applied, the governing standard.

*Blassingame* announced the test for evaluating Trump's claim to presidential immunity. It is binding law, *see LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996); GOB 45, and the Supreme Court reinforced it in *Trump*, 603 U.S. at 629-30.

##### 1. *Blassingame* establishes a context-specific standard for Trump's summary-judgment motion.

Presidential immunity is not afforded to every act "of the individual who happens to be the President." *Clinton v. Jones*, 520 U.S. 681, 701 (1997). The Supreme Court has thus rejected any immunity test "grounded purely in the identity of [the President's] office." *Id.* at 695; *see Blassingame*, 87 F.4th at 3, 15. Instead,

immunity shields only "official acts" that fall within "the 'outer perimeter' of [a President's] official responsibility." *Nixon v. Fitzgerald*, 457 U.S. 731, 754-56 (1982). Seeking office is not an official act. *Blassingame*, 87 F.4th at 17.

To determine whether a President is acting in his "official capacity or instead in his private capacity" as an office-seeker, courts analyze the "context" in which the President acts. *Blassingame*, 87 F.4th at 20. Contrary to Trump's assertions (*e.g.*, AOB 47), no single contextual consideration is dispositive. *Blassingame*, 87 F.4th at 21, 23, 30 (recognizing specific considerations "may not always point in the same direction," *id.* at 21). Given the range of relevant considerations, "the line between President and candidate [may] not always be clear." *Id.* at 20. "The potential difficulty of meting out that distinction," however, "cannot justify simply giving up on the enterprise altogether." *Id.*

When assessing which side of the line an action falls on, courts must examine whether "objective indicia" show the activity is "clothed in the trappings of an official function" or "bears the hallmarks of re-election campaign activity." *Id.* at 21. *Blassingame*

provides examples of "objective indicia" that an event is an "official function," including that it was:

- "[O]rganized . . . by official White House channels," or the "primary organizers" were federal-government officials or entities. *Id.* at 21-22.
- "[P]romoted by official White House channels." *Id.* at 21-23.
- "[F]unded with public resources." *Id.*

*Blassingame* also cautions that some pieces of context don't conclusively show that activity is official, because they may be present *regardless* of the activity's nature. *Id.* at 19, 21, 23. For example, a President is likely to be "introduced and referred to as the President," and may speak "at a podium affixed with the presidential seal," even when speaking in an "unofficial capacity." *Id.* at 19. And some individuals, like Secret Service agents, are present regardless of the event's nature. Payment of Expenses, 6 Op. O.L.C. 214, 217-18 (1982).

On the other hand, "objective indicia" that an activity "bears the hallmarks of re-election campaign activity" include that the activity was:

- "[O]rganized . . . by campaign channels, personnel, and resources," including by "former campaign staff." *Blassingame*, 87 F.4th at 21, 30.
- "[P]romoted . . . by campaign channels, personnel, and resources." *Id.* at 21.
- "[F]unded by campaign channels, personnel, and resources," including "by . . . a top . . . campaign . . . donor." *Id.* at 21.

After considering context, the content of a President's communications may be consulted, including "to confirm what an objective assessment of the context makes evident." *Id.* at 22. Content must be viewed within the broader context of the activity, because "[t]he same essential message or act may be either official or unofficial depending on the *circumstances* in which it is delivered or performed." *Id.* at 21 (emphasis added). For example, "[t]he President's delivery of the State of the Union address . . . is an official

act," but his delivery of some of the same messages "at a campaign rally" is "unofficial." *Id.*

Upon completion of that "appropriately objective, context-specific assessment," if a President's actions "can reasonably be understood as the official actions of an office-holder rather than the unofficial actions of an office-seeker," he is entitled to immunity. *Id.* at 30. It is the President's burden to establish this. *Id.* Accordingly, to prevail at summary judgment, Trump had to establish that there are no genuine disputes of material fact and, based on such a record, that his "actions can reasonably be understood as the official actions of an office-holder rather than the unofficial actions of an office-seeker." *Id.* If the record shows that the conduct "may reasonably be understood only as re-election campaign activity, a court not only may, but must deny immunity." *Id.* at 21-22. While a President is "afforded immunity" if the "objective, context-specific assessment yields no sufficiently clear answer in either direction," such a stalemate is unlikely to occur, as "courts can, in fact, tell the difference between official and unofficial conduct" and must draw

that line to "maintain" the "proper balance" in the "separation of powers." *Id.* at 20-22.[4]

### 2. The Supreme Court reinforced the *Blassingame* standard.

The Supreme Court in *Trump* affirmed the logic of, and cited approvingly to, *Blassingame*. *Trump*, 603 U.S. at 618. In *Trump*, the Court held that a President "may not be prosecuted for exercising his core constitutional powers" and is entitled to "presumptive immunity from prosecution" for other official acts. *Id.* at 642.

Like *Blassingame*, *Trump* recognized that determining whether acts outside a President's "core constitutional powers" are "official" or "unofficial" may "require[] a close," "fact specific" "objective analysis of 'content, form, and context.'" *Id.* at 593, 617, 628-29. And like *Blassingame*, *Trump* recognized that discerning when a President acts in an "unofficial capacity"—such as acting as

---

[4] The Government's attempt to frame the relevant question under *Blassingame* as whether the challenged conduct was "manifestly or palpably beyond [the President's] authority" (GOB 46; *see also id.* at 21) is unavailing. As the district court explained, "[t]he 'manifestly or palpably beyond' descriptor in *Blassingame* merely adds texture to the line between acts that lie within the outer perimeter [of official duties] and those that lie without." Op. 17.

a "candidate for office or party leader"—"may prove to be challenging," but is an assessment that courts must undertake. *Id.* at 617, 629. The district court thus correctly concluded that "there is no daylight between" the "fact specific" "objective analysis" laid out in *Trump* and the "'objective, context-specific assessment' required by *Blassingame*." Op. 13-14.

#### 3. Trump's manufactured distinctions between *Blassingame* and *Trump* cannot withstand scrutiny.

Trump falsely argues that *Trump* "did not embrace" the test announced in *Blassingame*, and that where "[t]he frameworks differ," "the Supreme Court's test must control." AOB 18, 36-37. More specifically, he manufactures two supposed distinctions between the cases.

*First,* he contends that *Trump* broke from *Blassingame* by announcing a "rule" that "'most of a President's public communications' fall within the broad sweep of his speech powers." AOB 18, 57. *Trump* did no such thing. Instead, *Trump*, consistent with *Blassingame*, stated that "most of a President's public communications are likely to fall" within his official responsibilities,

but acknowledged that determining whether any particular "comments to the general public" are official or unofficial "presents [a] difficult question[]." *Trump*, 603 U.S. at 617, 629; *see also Blassingame*, 87 F.4th at 15, 20 (similar).

In fact, *Trump* held that whether the Rally Speech specifically was "official" "depend[ed]" on a "factbound analysis" of its "content and context." 603 U.S. at 629-30. Trump concedes as much. AOB 19, 38 (recognizing *Trump* requires evaluating context, including who organized the Rally, to determine whether a communication is official). *Trump*'s factbound analysis is the same as that required by *Blassingame* and undertaken by the district court. *See* 87 F.4th at 20-21; Op. 4-58.

*Second*, Trump argues *Trump* placed a greater emphasis on the content of communications than *Blassingame*. *See, e.g.*, AOB 42.[5]

---

[5] Trump also points to *Snyder v. Phelps*, 562 U.S. 443 (2011), as support for a content-focused test. AOB 40. But *Trump* quoted *Snyder* for the proposition that "objective analysis of 'content, form, *and context*' will necessarily inform the inquiry." *Trump*, 603 U.S. at 629 (emphasis added). And *Blassingame* applied *Snyder* to demonstrate that even Trump's proposed test would require a contextual inquiry. *Blassingame*, 87 F.4th at 22.

Here, too, he's wrong, as neither decision elevated content *above* context. *Blassingame* recognized that "the content of a speech" can "serve to confirm what an objective assessment of the context makes evident." 87 F.4th at 22. Just the same, *Trump* explained that the "content" of communications may "*inform* the inquiry" alongside "context." 603 U.S. at 629 (emphasis added). And *Trump* recognized the importance of context, holding that communications on a topic were "readily categorized" as official in one context, while other communications on *the same topic* presented a "difficult question[]" in another context. *Id.* at 617, 628 (holding conversations about election fraud with Attorney General were official, but similar conversations with "state officials and private persons" required "close analysis" of context). In other words, both decisions recognize that the same words may be official or unofficial depending on the context in which they are delivered. *See id.*; *Blassingame*, 87 F.4th at 21.

Even if *Trump* and *Blassingame* differed in their framing on the margins—and they don't—that wouldn't permit departure from *Blassingame*. "For a panel to reconsider a prior decision of this court

in favor of new Supreme Court precedent, the [Supreme] Court's intervening decision must effectively overrule, *i.e.*, eviscerate" or "clearly dictate a departure from" circuit law. *Bahlul v. United States*, 77 F.4th 918, 925-26 (D.C. Cir. 2023) (citation modified). A slightly different formulation of *Blassingame*'s framework isn't evisceration—particularly because *Trump* and *Blassingame* addressed legally distinct questions. *Trump*, 603 U.S. at 605 (criminal prosecution); *Blassingame*, 87 F.4th at 4 (civil action); *see also, e.g.*, *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1336 (D.C. Cir. 2024) (where the "question before" this Court was "not answered" in the Supreme Court case, the case does not "clearly dictate a departure from circuit law").

* * *

"There is not always a clear line between" a President's "official" or "unofficial" actions, and distinguishing between the two is sometimes "challenging." *Trump*, 603 U.S. at 617, 629; *Blassingame*, 87 F.4th at 20. But as "President Trump himself" concedes, "courts can, in fact, tell the difference between official and

unofficial conduct." *Blassingame*, 87 F.4th at 20 (quoting Trump's *Blassingame* reply brief).

### B. Trump failed to show his Rally Speech was official.

Trump failed to establish his entitlement to immunity for the Rally Speech at summary judgment, and the arguments that he and the Government raise to excuse that failure are meritless.

#### 1. Trump failed to carry his burden under *Blassingame*.

Trump didn't present undisputed evidence that the Rally Speech had "the trappings of an official function," as *Blassingame* demands. 87 F.4th at 21. Indeed, the record points to only one reasonable conclusion: Trump spoke at the Rally as an office-*seeker*. The Rally was the culmination of Trump's months-long effort to sow doubt about his loss of the 2020 election. *See infra* Section I.C.2-4. Its organization, promotion, funding, and attendees all indicate the Rally Speech was office-seeking activity, and its content confirms this conclusion.

**a. *Rally organization*.**

The Rally's planning indicates the Rally Speech was unofficial. It is undisputed that, from its inception, the Rally was orchestrated by private actors—the majority of whom were current or recent Campaign affiliates. *E.g.*, SUF ¶¶ 123-25, 127, 159, 169, 180-85, 254, 311; Table D. WFAF—a private political organization dedicated to supporting Trump's agenda—conceived of and was "primarily responsible for organizing and planning" the Rally. Op. 31; *see also* SUF ¶¶ 123, 180-85, 311; SUF ¶ 223 (Trump conceding the Rally was WFAF's "own event"). WFAF secured the event permit and retained private vendors to handle event organization and logistics. SUF ¶¶ 186, 255. The permit described the Rally as a "March for Trump"—not a government function. *Id.* ¶ 185. It also identified twelve private individuals as the event's sponsors, coordinators, and on-site staff—ten of whom previously worked for the Campaign and *none* of whom were government employees. *Id.* ¶¶ 152-57, 161-66, 171-72, 186-99, 258-59; Table C; Op. 31-32. The other individuals who ran the event's logistics were likewise Campaign employees or affiliates—not government personnel. *E.g.*, SUF ¶¶ 136-37, 145-47,

260-62. Moreover, the "Guidance Memo" for attendees directed all questions to WFAF and Campaign affiliates; no point of contact was an executive-branch official. *Id.* ¶ 262.

The Rally's organizers understood it to be a political, unofficial event. A former senior Campaign advisor involved in the planning called the Rally a "DJTFP rall[y]"—*i.e.*, a Donald J. Trump for President rally. *Id.* ¶ 261. WFAF and other organizers represented or otherwise understood the event "was not an official event put on by the White House." *Id.* ¶ 174; *see also id.* ¶¶ 149, 254.

Katrina Pierson, a senior Campaign advisor through December 31, 2020, and not a government employee, was the Campaign's channel into WFAF's Rally planning. *Id.* ¶¶ 145, 147-48. For example, she texted a WFAF founder that "January 6th is D day" and relayed communications between the WFAF co-founders and potential funders. *Id.* ¶¶ 147, 180. Pierson also met with Trump to settle the Rally's speaker list and relayed Trump's wishes back to the private Rally organizers. *Id.* ¶ 267. The White House and executive branch were absent from this process. *Id.* ¶¶ 148, 263-70; Op. 38, 40.

The Rally Speech was initially drafted by individuals who worked on both official and political speeches, but the writers did so using their personal devices, personal email accounts, and Google Docs—tools they used for unofficial speeches. SUF ¶¶ 300-02, 320-22; Op. 23-24.

Trump's proffered evidence doesn't dispute these facts. Instead, he points to the presidential seal, the federal ground, and the White House backdrop. AOB 40. He argues that the "stage location" required a waiver request "from the White House Deputy Chief of Staff to the National Park Service," that the location was fixed at the "desire of the White House and the President," and that the location was "available to him because he was President." *Id.* at 41, 46. But these are unsupported assertions, not undisputed facts. And regardless, *Blassingame* found these sorts of details alone unpersuasive; a sitting President accepting his party's nomination at a podium bearing the presidential seal still "delivers the address in his private, unofficial capacity as candidate for reelection." 87 F.4th at 19. In fact, Trump accepted his own 2020 reelection nomination—conduct that is indisputably private under

*Blassingame*—on the White House lawn. SUF ¶ 2. And as Trump admits, the executive branch regularly helps arrange appropriate and secure settings for presidential appearances (*id.* ¶¶ 287-90)—official or otherwise.

Trump also attempts to assign significance to the absence of a Hatch Act notice on drafts of the speech. AOB 41. But the White House didn't consistently apply Hatch Act notices for unofficial speeches. *Id.* ¶¶ 294-99. In any event, the speech Trump delivered at the Rally differed significantly from the written words that lacked a Hatch Act notice, so that fact would have no bearing. *Id.* ¶¶ 340-45. In fact, a transcript of the Speech as delivered was treated as unofficial political speech by the executive branch. *Id.* ¶¶ 251, 303, 323-28, 346.

**b. *Promotion of the Rally.***

The promotion of the Rally also confirms its unofficial nature. *See Blassingame*, 87 F.4th at 22 (who "promoted" event is relevant context). The Rally was promoted "exclusively through private channels, including the Campaign's." Op. 33; *see* SUF ¶¶ 221-42, 247-50. The Campaign posted a video on its YouTube account,

urging viewers to "JOIN THE MARCH" (SUF ¶ 230); circulated an interview of a WFAF leader promoting the Rally on the Campaign's @TeamTrump account (which both Trump and a senior Campaign advisor retweeted (*id.* ¶¶ 240-42)); and posted "STOP THE STEAL" promotions on the Campaign's Instagram account (*id.* ¶ 250). Campaign staff also [redacted] and a Campaign employee was [redacted] *Id.* ¶¶ 231-37. Trump promoted the Rally on his personal @realDonaldTrump Twitter account. *Id.* ¶¶ 225-29, 238, 243-45; Op. 32. WFAF publicized the event, calling it the "March for Trump" and "MAGA MARCH." SUF ¶¶ 221, 239.

Conversely, neither the White House nor any executive-branch agency promoted the Rally. *Id.* ¶¶ 251, 323-24, 328. The White House designated a transcript of the Rally Speech as political rather than official. *Id.* ¶ 303. And although the White House regularly posts about the President's remarks on its official website, neither the archived Trump White House website nor the White House's YouTube archive contains a video or transcript of the Rally Speech.

*Id.* ¶¶ 304, 325-26; *see Blassingame*, 87 F.4th at 21-23 (whether White House "promoted" event is relevant context). Nor is there evidence that any other government office promoted the Rally. SUF ¶¶ 323-28.

#### c. *Rally funding.*

The Rally "was [also] funded entirely by private donations." SUF ¶ 203; *see Blassingame*, 87 F.4th at 21-22 (event "funded by campaign . . . resources" "is more likely" to be private). The Rally's expenses (exceeding $2.1 million) were underwritten principally by Julie Fancelli, a private donor who made significant contributions to Trump's Campaign. SUF ¶¶ 177-79. Those private funds were raised by a former Campaign finance advisor and distributed through private political channels. *Id.* ¶¶ 161, 177-79, 216-20. The Campaign, too, funded the event, including by paying for equipment rentals. *Id.* ¶ 204. There is no evidence of any federal money being used to fund the Rally.

#### d. *Rally attendees.*

The attendees and speakers at the Rally further underscore its unofficial nature. *Cf. Blassingame*, 87 F.4th at 23 (attendees can be

relevant context). There is no evidence in the record that any government official other than Congressman Mo Brooks (who spoke at the Rally in his personal capacity) attended. Every other speaker was a private individual closely tied to Trump's reelection effort—his family members; his then-personal lawyer; and Campaign surrogates Rudolph Giuliani and Kimberly Guilfoyle. SUF ¶¶ 271-81. Two of the speakers were paid from private funds. *Id.* ¶ 286.

**e. The Rally Speech's content.**

Contrary to Trump's and the Government's arguments (AOB 28-48; GOB 22-23, 46-49), the content of the Rally Speech *confirms* that it was unofficial. Op. 43. As Judge Rogers noted in her concurring opinion in *Blassingame*, "President Trump's alleged words and actions were directed toward promoting his victory in the 2020 presidential election rather than . . . official purposes." 87 F.4th at 35 (Rogers, J., concurring).

In his speech, Trump repeated false claims that the election had been stolen and called for Pence to help him "win." SUF ¶ 338. He told the crowd, "I've been in two elections; I won them both, and the second one I won much bigger than the first"; declared that "all

of us here today do not want to see our election victory stolen by emboldened radical-left Democrats"; and said, "if Mike Pence does the right thing, we win the election." *Id.* ¶¶ 337-38. Those statements—explaining how and why he should stay in office—reflect office-seeking behavior. Finally, Trump implored the crowd to "fight like hell," before instructing his rallygoers to "walk" to the Capitol to "take back our country." *Id.* ¶¶ 336, 339. As this Court explained, "an incumbent President's interests in winning re-election have the same purely private character as those of his challengers." *Blassingame*, 87 F.4th at 17.

These remarks confirm what the context already reveals: Trump's Rally Speech was office-seeking activity. *See Blassingame*, 87 F.4th at 5, 19.

### 2. Trump's attempts to evade *Blassingame*'s controlling standard for assessing the Rally Speech fail.

Faced with an overwhelming undisputed factual record demonstrating that the Rally Speech was delivered at an unofficial event, Trump and the Government urge the Court to forgo the

requisite contextual analysis and mischaracterize the district court's application of *Blassingame*. Their arguments are meritless.

**a. This Court has already rejected Trump's Article II argument.**

Trump argues that the Rally Speech is immune because he was exercising an "enumerated Article II power" under the Recommendations Clause "to propose measures to Congress." AOB 29, 35. But *Blassingame* rejected a parallel argument: that Trump's January 6 conduct was official because he was acting under the Take Care Clause to address election fraud. 87 F.4th at 24. This Court held that simply invoking an Article II duty, "at least without more," fails, because it "assumes the answer to the question whether he acted in an official capacity as office-holder or in a private capacity as office-seeker." *Id.* And as both the Supreme Court and this Court have explained, the same words can be official or unofficial, depending on context. *Id.* at 21; *see Trump*, 603 U.S. at 629-30 (directing that status of Rally Speech depends on a "factbound analysis").

For example, "[a]n incumbent President seeking re-election could offer recommendations to Congress during the State of the Union and then make the very same recommendations the next day at a campaign rally." Op. 20; *Blassingame*, 87 F.4th at 24. The former would be official, while the latter would be unofficial. *Blassingame*, 87 F.4th at 21. Here and below, Trump made "no argument as to why [the Rally Speech] should be treated more like the State of the Union than [a] campaign [speech]." *Id.* at 24.[6] The one assertion Trump makes that would speak to this question—that he addressed "a pending congressional proceeding"—is contradicted by the undisputed record. Trump was, in fact, speaking to a crowd of his political supporters. *Compare* AOB 35, *with supra* at 8-9.

The essence of Trump's argument is that, anytime a President speaks on policies that Congress could adopt, his conduct is "neatly

[6] Trump argues that the district court applied a "flawed theory that a recommendation must resemble the State of the Union." AOB 34. The court held no such thing. As *Blassingame* requires, the district court properly analyzed context to determine whether the Rally Speech was *more like* a State of the Union address, and thus official activity, or *more like* a campaign speech, and thus unofficial activity. Op. 20.

categorized" as official, regardless of context. AOB 30, 35. This is squarely contrary to *Blassingame*. 87 F.4th at 24. And it is contradicted by *Trump*'s instruction that whether the Speech was official would require a "factbound analysis." 603 U.S. at 630. This Court should reject it.

**b. This Court already rejected Trump's and the Government's "bully pulpit" argument.**

Trump and the Government contend the Speech is immune because "it was an exercise of the President's recognized bully-pulpit authority." AOB 36; *see* GOB 53. But the Supreme Court and this Court have already held that the President is not entitled to blanket immunity for speech on matters of public concern.

In *Blassingame*, as here, Trump argued that "all of a President's speech on matters of public concern, as a categorical rule, is an exercise of official presidential responsibility." 87 F.4th at 15. This Court rejected that argument. *Id.* It explained that "immunity for all presidential speech on matters of public concern—without regard to the context in which the President speaks—would be grounded purely in 'the identity of the actor who performed it' rather

than 'the nature of the function performed,'" and yield "a result that is 'unsupported by precedent.'" *Id.* at 16 (quoting *Clinton*, 520 U.S. at 695).

And as discussed above, *see supra* Section I.A.2-3, the Supreme Court in *Trump also* rejected Trump's blanket "bully pulpit" argument. *Trump* recognized that "[t]here may . . . be contexts in which the President . . . speaks in an unofficial capacity—perhaps as a candidate for office or party leader." 603 U.S. at 629-30. And the Supreme Court declined to grant Trump blanket immunity for the Rally Speech, instead requiring an analysis of its "content and context." *Id.* at 630.

Trump tries to transform the Rally Speech into an office-holding act by inventing new criteria absent from *Blassingame*: He says the Speech does not bear "hallmarks of strictly campaign speech" and was not given in a "forum available to the President 'strictly' because he was a candidate." AOB 44. But *Blassingame* doesn't condition immunity on whether a particular speech, taken out of context, could *only* have been given by a candidate. Instead, *Blassingame* asks whether a particular speech, evaluated in context,

"may reasonably be understood only as re-election campaign activity." 87 F.4th at 21-22. The undisputed record demonstrates that the Rally Speech meets this governing test.

The brand-new criteria Trump tries to impose would allow a President to invoke immunity simply by standing anywhere an incumbent President might stand when *not* seeking reelection. For example, a President could claim immunity for a campaign fundraising call made from the Oval Office. The Court should reject this legally unsupported result.

With no evidentiary or legal support, Trump further proclaims that the Rally Speech was "the opposite of a campaign speech—because it was a speech that only a sitting President could give." AOB 45.[7] That's wrong. Any private candidate can publicly call on others to help her win or discuss "proposed prospective reforms to federal law." *Id.* at 46. In asserting that, as President, he is uniquely positioned to discuss these matters of public concern—and therefore

---

[7] Trump also claims that he "continues to press Congress for similar election-integrity reforms." AOB 45. But in doing so, he cites evidence he didn't present below that should be disregarded. *See Goland v. Cent. Intel. Agency*, 607 F.2d 367, 371 (D.C. Cir. 1978).

immune for discussing them—Trump is rehashing the identity-of-the-office and bully-pulpit arguments that the Supreme Court and this Court have expressly rejected. *See supra* Section I.A.

Moreover, even assuming the content of the Speech alone can determine its nature (it can't), many of the statements Trump now invokes were also included just two days earlier in a speech Trump admittedly gave solely as an office-seeker. *See Blassingame*, 87 F.4th at 21; SUF ¶¶ 41, 336. Specifically, on January 4, 2021, Trump appeared at a rally in Dalton, Georgia—an event Trump concedes was unofficial. AOB 41; *see Lee*, Dkt. 144-1 at 21 (Trump describing it as "a political event"). In Dalton, Trump made many of the statements that he now asserts make the Rally Speech official, including:

- he rebuilt the military;
- he "hope[d] Mike Pence comes through";
- that only a state legislature, not a judge, can change the rules for a federal election; and
- "[w]e want voter ID."

SUF ¶ 336; Table B; AOB 45-46. Thus, by Trump's own admission, these statements cannot transform a speech into an executive branch activity.

**c. Trump's arguments about the extent of Campaign involvement in the Rally are factually and legally unsound.**

Trump also argues that an activity can only be understood as reelection campaign activity if it was organized and funded *solely* by the Campaign, pointing to *Blassingame*. AOB 47. But an event need not be "a fully baked campaign event" to be unofficial. Op. 41; *see also Blassingame*, 87 F.4th at 32 (Katsas, J., concurring). Rather, office-seeking activity may occur at venues that are not campaign-sponsored at all, including "a political party's convention, a fundraiser, or 'other political events.'" Op. 41-42; *Blassingame*, 87 F.4th at 20, 32. The dispositive question is not whether the Rally was funded or conceived of solely by the Campaign, then, but whether Trump appeared there as an office-seeker.

Trump's claim that the Rally "lack[ed] campaign involvement" (AOB 47) cannot be squared with the undisputed evidence. The Campaign admitted to paying for the Rally's rental equipment, it

promoted the event through its own social-media channels, and a senior Campaign advisor helped organize it.[8] *See supra* Section I.B.1.a-c. Those undisputed facts confirm that the Rally Speech was the act of an office-seeker.

Trump's and the Government's emphasis on the district court's statement that "the allegation of one Plaintiff that the Rally was organized and funded by Trump's campaign organization has not panned out" (AOB 20, 47; GOB 13, 47) is therefore misplaced. Both Trump and the Government overlook the district court's finding that "Trump's representation . . . that the January 6th rally is in no way related to the campaign . . . has not borne out either." Op. 41. As discussed, the district court correctly concluded that, based on the undisputed evidence, "the Campaign had a hand in [the Rally]." *Id.* at 41; *supra* Section I.B.1.

[8] Trump argues that the district court found Campaign involvement only by wrongly relying on an admission by the Campaign—an admission Trump contends is "inadmissible evidence" because it was not "'offered against' the party who made . . . it." AOB 46. But to raise a valid objection at summary judgment, Trump had to have argued that the fact "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Trump didn't do so.

#### d. Trump's lack-of-knowledge argument is forfeited and unsupported.

Trump also argues, for the first time, that "[i]mmunity must be knowable to the President at the moment he acts," and the district court erred by resting on "contextual factors the President could not have known when he spoke." AOB 48. But Trump's argument is forfeited and unsupported.

To start, Trump never made this argument below. "It is well settled that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal." *District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984).

Trump's argument also flies in the face of the "objective" governing standard. *Blassingame* expressly requires consideration of the very facts Trump says he was subjectively unaware of, such as the way in which the *"executive branch* . . . treat[ed] the activity in question." 87 F.4th at 21 (emphasis added). When the Court applied that instruction to the July 4th Salute to America event, it looked to the event's funding, organization, promotion, and attendance, as well as what the White House did with the remarks afterward. *Id.*

at 22-23. All those facts, which *Blassingame* says are relevant, reflect either the conduct of someone other than the President or something that happened after he finished speaking. These are exactly the pieces of "trivia" that Trump now says are too granular or too distant from his own knowledge to play a role in the immunity analysis (AOB 49-50), but which *Blassingame* expressly considered in conducting that analysis. 87 F.4th at 22-23.

Moreover, by asking the Court to focus on what he knew at the time he delivered the Rally Speech, Trump is asking this Court to undertake precisely the sort of "intrusive" inquiry into the President's thoughts that this Court and the Supreme Court have disallowed. *Blassingame*, 87 F.4th at 13 (quoting *Nixon*, 457 U.S. at 756); *see Trump*, 603 U.S. at 618.

Trump's cited authority, *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), doesn't help him. First, *Kingsley* concerns a determination of whether an officer's use of force was excessive based on the "perspective of a reasonable officer on the scene"—*not* whether the officer was entitled to qualified immunity. *Id.* at 396-97. *Kingsley*

thus doesn't support Trump's argument that *presidential* immunity depends on what is "knowable" at the relevant time. AOB 48.

Similarly, Trump cites *Anderson v. Creighton* for the proposition that the President should be able to "reasonably anticipate when [his] conduct may give rise to liability for damages." AOB 50 (quoting 483 U.S. 635, 639 (1987)). Like *Kingsley*, *Anderson* does not deal with presidential immunity or whether an action is official or unofficial and thus has no bearing here. And in any event, Trump assumes too much in stating that he could not "reasonably anticipate" that his own government, his own Campaign, and individuals closely affiliated with his Campaign were treating the Rally as a reelection event.

This leads to another fatal problem with Trump's newly constructed argument: Even *if* Trump's knowledge-based standard were the law, he has no evidentiary support. He didn't demonstrate that he couldn't have known or didn't know who organized the Rally, who paid for it, or how his staff and the executive branch handled the Speech. His assertion that "[t]here is no evidence—none—that the President would be aware of these granular details" (AOB 49-50)

inverts the burden, which requires that *Trump* establish no genuine dispute as to whether his actions were official. *See supra* Section I.A. Regardless, the record cuts the other way: Trump was personally involved in planning and promoting the Rally, including choosing speakers and promoting the Rally from his own Twitter account. SUF ¶¶ 225-29, 267-68. The Court should reject Trump's knowledge-based arguments.

**e. *Blassingame* specifically prescribed the "official trappings" inquiry.**

Trump argues the district court departed from *Blassingame* by inventing an "official trappings" requirement and treating it as a mandatory checklist. AOB 51-53. But the official-trappings language comes directly from *Blassingame*. *See* 87 F.4th at 21. And the district court didn't convert the indicia of "official trappings" articulated in *Blassingame* into a mandatory checklist. AOB 52. Instead, it looked at all of the "objective, undisputed contextual facts" offered by the parties (including facts that Trump wrongly argues were "overlook[ed]" (*compare* AOB 52, *with* Op. 23-24)) and held those facts "support only one reasonable understanding of the Rally

Speech: President Trump delivered it as an office-seeker still attempting to secure re-election and not as an incumbent office-holder." Op. 41.[9]

Trump's argument that "[p]rivate venues and private sponsors have never stripped an incumbent President's remarks of their official character" (AOB 52) is another distraction. As the district court acknowledged, "Presidents sometimes act in their official capacities at privately sponsored events." Op. 42. But what matters is the specific context surrounding *this* Rally and *this* Speech; and Trump has failed to carry his burden of demonstrating those were official. Indeed, as the district court noted, "the most comparable event on this record—the Dalton political rally that occurred only two days prior"—was indisputably unofficial. Op. 42; Table B.

[9] The Government repeatedly argues that the district court denied Trump's summary-judgment motion because the event "bore a closer 'resemblance' to a campaign event than an official one." GOB 20. The Government's argument ignores this actual holding from the district court, which plainly addresses the proper inquiry under *Blassingame*.

### f. The district court didn't examine Trump's motives.

The Government also argues the district court improperly inquired into Trump's motives. GOB 51-52. That, too, is wrong. The district court confirmed it "may not" and didn't "consider [Trump's] allegedly improper motives or allegations of illegality." Op. 22 n.4.

The Government relies on a single sentence (GOB 51) from the district court's decision, in which the district court quoted the *Blassingame* concurrence: "President Trump's alleged words and actions were directed toward promoting his victory in the 2020 presidential election rather than carrying out a designated official duty to confirm the integrity of the electoral process, to ensure faithful execution of the laws, or to fulfill other official purposes." Op. 43 (quoting 87 F.4th at 35 (Rogers, J., concurring)). The district court reproduced that language to describe the *conclusion* it reached based on an objective inquiry. It didn't need to, and didn't, consider Trump's motive to conclude that his actions were unofficial. Op. 36.

### C. Trump fails to show his other actions were official.

Alongside the Rally Speech, Plaintiffs contend that some of Trump's tweets, outreach to state and local officials concerning the election results, election-night declaration of fraud, election-fraud litigation, and role in the false-elector scheme were part of the conspiracy that injured Plaintiffs. SUF ¶¶ 21-50, 51-74, 75-97, 103-16, 230, 240, 246-50, 336; *e.g.*, *Smith* Compl. ¶¶ 49-50, 60, 62, 67, 72. On appeal, Trump addresses only two of his tweets, one communication sent by his Campaign, and his outreach to state and local officials, and thus necessarily concedes he is not entitled to immunity for the remaining at-issue conduct. As to the conduct he addresses, Trump fails to carry his burden of showing that he is entitled to immunity. Op. 55-57.

#### 1. Trump abandoned his immunity arguments for most conduct other than the Rally Speech.

The district court properly denied Trump immunity for (i) certain statements at campaign rallies and political events; (ii) his election-night declaration that the results of the election in which he participated were "a fraud on the American public"; (iii) his

Campaign's statements and social-media postings; (iv) lawsuits filed (by him or his Campaign) challenging election results; and (v) his role in the false-elector scheme because Trump "offer[ed] no contextual evidence." Op. 55-57. On appeal, Trump chose not to address this conduct. Trump has thus conceded that he is not entitled to immunity for it. *See Tuckson v. United States*, 77 A.3d 357, 366 (D.C. 2013).

Forfeiture aside, the district court's determination finds ample support in the record. Statements made at campaign rallies and other political events (*e.g.*, SUF ¶¶ 24-25, 41-42) are "inherently" unofficial because they are made in the capacity of an office-seeker. *Blassingame*, 87 F.4th at 18. So too are Trump's election-night remarks that he "frankly . . . did win this election" (SUF ¶ 26) and social-media posts from the Campaign's accounts (SUF ¶¶ 86, 230, 240, 246-50). *Blassingame*, 87 F.4th at 21. Moreover, Trump's lawsuits challenging state-election results were filed either by Trump, the Campaign, or others on behalf of his candidacy (SUF ¶¶ 103-15), placing them squarely outside the protection of presidential immunity. Finally, Trump's actions in the false-electors

scheme were supported by unofficial parties, including Campaign affiliates and Trump's Campaign Twitter account. *E.g.*, SUF ¶¶ 57-72.

This Court should affirm the district court's determination.

**2. Trump failed to show his tweets and a Campaign communication before the Rally were official.**

Trump failed to show his pre-Rally tweets and a Campaign communication on January 5, 2021, were issued in his capacity as an office-holder, and the undisputed record establishes the opposite.

**a. On appeal, Trump failed to address adequately most of this conduct.**

Of the "more than 35" pre-Rally tweets that the district court held were nonimmune, Trump meaningfully addresses only two on appeal, as well as one public statement that the Campaign issued. Op. 48; *see* AOB 55-57; SUF ¶¶ 1, 21-23, 27-40, 45, 47-49, 90, 225-29, 238, 241, 243-45, 347. For the others, he offers a makeweight argument that "[m]ost" tweets relate to fraud in a national election, which, according to Trump, the President is "expected to comment on." AOB 56 (quoting *Trump*, 603 U.S. at 629). That gets the law

wrong. True, *Trump* recognized that there are matters of public concern not directly tied to federal-government activities that the President will comment on—like national "emergenc[ies] or traged[ies]." 603 U.S. at 629. But that recognition doesn't eviscerate the need to distinguish between office-seeking and office-holding conduct, because presidential immunity can't arise merely because the conduct pertains to "matters of public concern." *Blassingame*, 87 F.4th at 23; *Trump*, 603 U.S. at 629. Rather, there are "contexts in which the President, notwithstanding the prominence of his position, speaks in an unofficial capacity," including when, as here, he spoke "as a candidate for office or party leader." *Trump*, 603 U.S. at 629.

In light of these tweets' content and context—like promoting his candidacy (*e.g.*, SUF ¶ 1), attacking the legitimacy of his election loss (*e.g.*, SUF ¶ 37), and urging supporters to help him "overturn" the result (*e.g.*, SUF ¶ 39)—none of these tweets falls within any official presidential function. But in any event, Trump's single-sentence argument concerning these tweets is inadequate.

*Consolidated Edison Co. of N.Y., Inc. v. FERC*, 510 F.3d 333, 340 (D.C. Cir. 2007).

**b. The conduct Trump does address wasn't official, either.**

Trump fares no better in demonstrating an entitlement to immunity for the two tweets and Trump Campaign statement (which Trump mischaracterizes as a tweet) that he addresses on appeal. AOB 55-57 (citing SUF ¶¶ 40, 45-46). *Trump*, *Blassingame*, and the Supreme Court's decision in *Lindke v. Freed*, 601 U.S. 187 (2024), make clear that Trump didn't and can't do so. All three decisions emphasize that social-media posts must be evaluated on an individual basis, based on their substance and the context in which they were issued. Under *Trump*, courts must individually assess "the content and context of each" tweet to determine immunity. 603 U.S. at 629-30. And under *Lindke*, social-media activity constitutes official conduct only if the speaker "(1) had actual authority to speak on behalf of the State *on a particular matter*, and (2) purported to exercise that authority *in the relevant posts*." 601 U.S. at 204 (emphasis added). This "turns on substance, not labels." *Id.* at 197;

*see Trump*, 603 U.S. at 629-30. Put another way, Trump cannot obtain immunity by merely pointing to his "status" as President. *Lindke*, 601 U.S. at 197; *see Blassingame*, 87 F.4th at 21.

Trump failed to put forth the necessary evidence *specific to each tweet*. Op. 50. Rather, he "eschews this 'fact-specific undertaking,'" *id.*, and relies on the status-based approach that *Lindke*, *Blassingame*, and *Trump* forbid, *supra* Section I.A, I.C.2.b. His evidence boils down to mere blanket assertions about all his tweets: His press secretary called *all* his tweets "official statements," a staffer "helped run" his *entire* Twitter account, the *entire* account bore his title, and agencies archived *all* his tweets. AOB 56. But Trump has conceded that *some* of his tweets were not official. SUF ¶ 15. And he offers no contextual evidence capable of showing how a *particular* tweet could be understood as being issued in his official capacity. Op. 49.

Moreover, Trump doesn't grapple with the undisputed contextual evidence establishing that the two tweets and Campaign statement were unofficial. Nor does he address their content, which confirms they were unofficial.

Start with Trump's January 5 tweet (SUF ¶ 45) and his Campaign's statement (SUF ¶ 46) that Trump agreed with Mike Pence that Pence could interfere with the election. AOB 56. First, actions by a political campaign are paradigmatically unofficial under *Blassingame*. 87 F.4th at 20. Second, the fact that Trump's tweet so extensively mirrors his Campaign's statements from the same day further highlights that Trump acted in his office-seeking capacity to pressure Pence to throw the election in his favor. *Compare* SUF ¶ 45, *with* SUF ¶ 46. Third, there is no evidence that the tweet or the statement was issued or promoted by the Twitter accounts operated by the White House or via any other executive-branch channels. Fourth, both statements are part of a broader scheme by Trump to use pressure to instigate action that would change the outcome of the election in which he sought office. And both statements were issued when Trump was attempting to remain in office and were published close in time to other tweets that clearly focused on reelection messages, such as: If Pence sent the vote "back to the States . . . WE WIN," and "[i]f Vice President @Mike_Pence

comes through for us, we will win the Presidency." *E.g.*, SUF ¶¶ 47, 49. These are the words of an office-seeker.

Next consider the December 26 tweet, conveying Trump's view that law enforcement hadn't adequately addressed his allegations of fraud in the "2020 Presidential Election," encouraging his audience to "[n]ever give up," and saying he would "[s]ee everyone in D.C. on January 6th." SUF ¶ 40. Trump argues this was official conduct because the tweet sought to "[p]ress[] the . . . Executive Branch agencies to act." AOB 56. But the tweet doesn't include a call for "Executive Branch agencies to act." And his complaint about law enforcement failing to find fraud is accompanied by encouragement to overturn the results of the election and a call to action to his political supporters.

Because Trump bears the burden of proof on immunity, this Court should affirm the district court's holding on these three statements.

### 3. Trump failed to show his outreach to state and local officials was official.

A President "has no authority over state legislatures or their leadership." *Trump*, 603 U.S. at 653 (Barrett, J., concurring). Accordingly, determining whether outreach to such officials qualifies as official "requires a close" "fact specific" "analysis." *Id.* at 628 (majority op.). Here, too, Trump didn't provide any of that required evidence. Plaintiffs, on the other hand, presented undisputed evidence demonstrating Trump acted as an office-seeker. *See* Op. 43-48; SUF ¶¶ 75-83, 86-97.

The district court properly denied Trump's summary-judgment motion as to six phone calls with state and local officials (Op. 45-46), none of which Trump specifically addresses. In each call, Trump pressured state and local officials to reverse certified results solely in states he had lost, and Trump framed his demands in terms of electoral victory or defeat. For example, Trump told Georgia's secretary of state to find "11,000 votes" with three Campaign lawyers on the line (SUF ¶¶ 91-95) and told the Pennsylvania legislature his defeat "ha[d] to be turned around" (*id.* ¶ 75).

In addition, the Campaign was the main entity involved in outreach to state and local officials to sway the election in Trump's favor. For example, on January 3, 2021, the official Campaign Twitter account, @TeamTrump, urged supporters to get Michigan leaders to "[c]orrect false statements" and "[d]emand [a] vote on decertification" after the state unanimously certified the election results for former President Biden. *Id.* ¶¶ 81, 86. Trump made the object of the outreach effort explicit, observing "we would have already won both Arizona and Georgia" if the two states' governors "were with us." *Id.* ¶ 90. These contacts with local and state officials were the acts of a candidate seeking to retain office, not a President discharging any official duty. Op. 43-48; *see State v. Meadows*, 88 F.4th 1331, 1349 (11th Cir. 2023).

Trump doesn't meaningfully argue otherwise, instead observing in a single paragraph that a President "may speak on and discuss [the fairness and integrity of federal elections] with state officials," and declaring that "[t]he other calls and discussions are no different" from a meeting the district court found immune because it occurred in the Oval Office. AOB 57-58. While hypothetical

presidential outreach to state officials *could* be official, Trump's outreach *here* was not. As the district court noted, he adduced *no* undisputed facts that would establish his conduct was official. Trump's request to immunize the conduct at issue should thus be rejected.

#### 4. Trump's attempt to shield his pre-Rally conduct fails.

Trump wrongly asserts this Court "need not reach the President's earlier communications" that predate the Rally Speech because Plaintiffs "conceded that all non-Ellipse speech is protected by the First Amendment." AOB 54. Plaintiffs made no such concession, no court has ever held that the First Amendment applies to Trump's non-Rally speech, and whether the First Amendment could apply to that speech is not an issue before the Court. Even if it were, Trump's theory rests on mischaracterizations of the record and law.

Trump's argument stems from a motion to dismiss that the district court denied in 2022. In that motion, Trump raised a First Amendment defense. *See Blassingame*, Dkt. 10-1 at 22-28. In

denying the motion, the district court declined to address whether the First Amendment protected Trump's pre-Rally speech because, as the district court put it, "[t]he parties focused on the Ellipse Speech, so the court did, too." Op. 58; *Blassingame*, Dkt. 37 at 89. Put differently, the district court reached *no* conclusion about Trump's pre-Rally conduct and *didn't* find that the First Amendment applied to Trump's pre-Rally speech.

Trump never appealed that order. Instead, in 2025, he sought reconsideration of the denial of his motion to dismiss on First Amendment grounds. *Lee*, Dkt. 145. In the alternative, he asked the district court to certify for interlocutory review a narrow, specific question: whether his "January 6 Speech was constitutionally protected." *Lee,* Dkt. 145-1 at 32. The district court denied his motion for reconsideration and certified an issue for interlocutory review that necessarily included the Rally Speech. Op. 69. Trump's petition for permission to appeal also phrased the question presented as relating to the First Amendment's application to the Rally Speech only. Petition at 4-5, *Lee v. Trump*, No. 26-8003 (D.C. Cir. Apr. 10,

2026) (Dkt. 2168570). This Court accepted Trump's petition. Order, *Lee v. Trump*, No. 26-8003 (D.C. Cir. June 4, 2026) (Dkt. 2176810).

Trump now asks the Court to reach beyond the certified question to an issue that he never properly addressed in his five-year-old motion to dismiss. *See Cruz v. Am. Airlines, Inc.*, 356 F.3d 320, 329 (D.C. Cir. 2004) (courts have "well-established discretion not to consider claims that litigants fail to raise sufficiently below and on which district courts do not pass"). Trump's request that the Court hold that Plaintiffs somehow forfeited any response to a First Amendment argument that he never adequately made below—and that the district court didn't rule on and that Trump didn't raise in his own defense—is procedurally and jurisdictionally improper and should be rejected. Even if Plaintiffs had somehow forfeited an argument in the 2022 motion to dismiss briefing, Trump himself has forfeited that argument by failing to raise it below. *See Solomon v. Vilsack*, 763 F.3d 1, 14 (D.C. Cir. 2014); *Keepseagle v. Perdue*, 856 F.3d 1039, 1053 (D.C. Cir. 2017); *e.g.*, *Blassingame*, Dkt. 28; *Lee*, Dkt. 145-1; *Lee*, Dkt. 171 (Trump never asserting forfeiture).

### D. The district court erred in granting summary judgment as to Trump's 2:24 p.m. tweet.

Although the district court correctly recognized that Trump didn't meet his burden as to most tweets, it incorrectly found that a tweet issued at 2:24 p.m. on January 6, 2021, was immune. Op. 54-55; *Lee*, Dkt. 253 at 9.

Trump's 2:24 p.m. tweet came from his @realDonaldTrump account while rioters breached the Capitol and Pence sheltered from the mob. SUF ¶¶ 348-49. It read: "Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution, giving States a chance to certify a corrected set of facts, not the fraudulent or inaccurate ones which they were asked to previously certify. USA demands the truth!" *Id.* ¶ 349.

Trump never sought summary judgment as to this tweet and made no direct mention of it in his papers. *See Lee*, Dkt. 144-1. In addition, the district court's ruling on this tweet was based on facts that were not included in the parties' statements of undisputed facts. Because Plaintiffs were given no notice that they should present arguments as to the tweet and had no chance to dispute the facts the

district court relied on, summary judgment should not have been granted. *McBride v. Merrell Dow & Pharms., Inc.*, 800 F.2d 1208, 1211-12 (D.C. Cir. 1986). Regardless, Trump has not and cannot carry his burden of demonstrating that he is entitled to summary judgment on the tweet.

**1. The district court erred in granting summary judgment without notice to Plaintiffs.**

A district court may only grant summary judgment "on grounds not raised by a party" if it gives "notice and reasonable time to respond" to the party against whom the judgment will be entered. *See* Fed. R. Civ. P. 56(f); *Stewart v. Credit Bureau*, 734 F.2d 47, 53 n.10 (D.C. Cir. 1984). It "cannot deny the existence of disputes over material facts by making findings of fact and then labelling them 'undisputed.'" *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147-48 (D.C. Cir. 1989). These principles constrain a district court's ability to grant summary judgment *sua sponte*. General arguments are insufficient to comply with Rule 56(f)'s notice requirement as to specific issues or conduct. *See, e.g.*, *McBride*, 800 F.2d at 1211-14 (vacating order where party was not on notice of potential for *sua*

*sponte* grant of summary judgment); *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007) (similar); *cf. Robbins v. District of Columbia*, 650 F. App'x 37, 40-41 (D.C. Cir. 2016) (holding *sua sponte* summary judgment permissible because plaintiff engaged with unraised issue in briefing). As a result, a district court may not grant summary judgment where the moving party does not put a topic at issue and where the nonmoving party has no notice or chance to respond.

Here, Trump failed to seek immunity as to his 2:24 p.m. tweet; his opening brief merely included a footnote with a string cite to complaint paragraphs, some of which included the text of the 2:24 p.m. tweet, *Lee*, Dkt. 144-1 at 2 n.4, and otherwise didn't mention the tweet or the context that would make it official. Accordingly, Plaintiffs were not given any notice to address the nature of that tweet. Nor did Plaintiffs make any specific arguments as to the tweet that would suggest notice in fact. *Cf. Robbins*, 650 F. App'x at 40-41; Op. 54. The district court's decision to grant summary judgment therefore should be vacated.

Trump tries to paper over this defect by pointing to stray lines in his summary-judgment papers, arguing that he is entitled to "absolute civil immunity for any tweet" implicating Article II authority. *Lee*, Dkt. 144-1 at 28. But as discussed above, *supra* Section I.C.2.b, Trump's categorical defense cannot substitute for the requisite tweet-by-tweet analysis. If Trump's argument is credited, Plaintiffs would have been given the impossible task of arguing *against* immunity as to *all* of the thousands of tweets on Trump's Twitter account, improperly reversing *Trump's* burden of establishing that he is entitled to immunity as to specific acts. *Cf.* Fed. R. Civ. P. 56(a); *Grimes v. District of Columbia*, 794 F.3d 83, 93-94 (D.C. Cir. 2015) ("The burden that the movant always bears is that of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." (citation modified)).

### 2. Trump failed to show his 2:24 p.m. tweet was official conduct.

Even if Plaintiffs had been given notice that Trump was seeking immunity as to his 2:24 p.m. tweet, the district court erred in granting summary judgment because: (a) Trump didn't meet his burden, and (b) the undisputed facts demonstrate that the tweet was made in his role as an office-seeker.

#### a. Trump didn't meet his burden.

Trump failed to demonstrate that there was no genuine dispute as to any material fact about whether he was acting in his official capacity when he published the 2:24 p.m. tweet. To carry his burden, he was required to "cite[] to particular parts of materials in the record" demonstrating no dispute of fact. Fed. R. Civ. P. 56(c)(1)(A). But the district court acknowledged that "[n]either side ha[d] offered specific facts" about the 2:24 p.m. tweet's circumstances. Op. 54. The district court was correct; Trump's own Statement of Undisputed Material Facts includes *no facts* specifically relating to his 2:24 p.m. tweet—further evidence that he didn't intend to move for summary judgment on this tweet. *See generally* CSUF.

That should've been dispositive. As the district court held as to other tweets, "[b]ecause [Trump] has essentially offered no" contextual evidence that the 2:24 p.m. tweet can reasonably be construed as official conduct, "he has not carried his burden." Op. 52. In fact, in all other instances where Trump failed to advance facts in support of his argument, the district court correctly denied summary judgment. Op. 45, 48, 55 (denying summary judgment "[g]iven complete absence of relevant evidence" from Trump); *see supra* Section I.C.1. The same outcome should have been reached for the 2:24 p.m. tweet.

**b. The context and content of the tweet demonstrate that it is not subject to immunity.**

The available context-specific evidence makes clear that Trump could not have met his burden as to the 2:24 p.m. tweet. Trump was acting as an office-seeker when he issued the tweet or, at the very least, a genuine dispute of material fact exists, making the grant of summary judgment inappropriate. *Trump*, 603 U.S. at 630.

First, the context confirms Trump was acting as an office-seeker when he issued the tweet.[10] It was published during a period when Trump's official activities were not recorded by the Presidential Daily Diary, which tracks presidential meetings and calls. *Lee*, Dkt. 173-24 at 593; Op. 77. Trump turned away the White House photographer as he sat in the Presidential Dining Room watching the attack unfold on cable news. *Lee*, Dkt. 173-24 at 593; Op. 77. Right before he issued the tweet, Trump was speaking with his personal lawyer, Rudolph Giuliani, and calling congressional supporters who were trying to throw the election in his favor. *Lee*, Dkt. 173-24 at 593-94; Op. 77. He then published the tweet from his personal Twitter account. After publishing it, Trump called more members of Congress to "talk objections to the electoral count." *Lee*, Dkt. 173-24 at 598; Op. 77. These contemporaneous events—actively campaigning to have members of Congress support his reelection,

[10] The facts cited here come not from the parties' statements of undisputed facts; they draw from the Select Committee's report. Though the district court drew from this report, it didn't consider these facts or whether they created a genuine dispute of material fact. Op. 46 n.19; *see also, e.g., Lee*, Dkt. 253 at 7.

engaging with his private attorney, and excluding White House staff from his presence—demonstrate he wasn't acting in his official capacity when he issued the tweet. *See Trump*, 603 U.S. at 630.

The tweet's content further confirms Trump was acting as an office-seeker. The tweet directly addresses Trump's political supporters, attacking Pence for lacking "the courage" to secure Trump's reelection and urging supporters to "demand[] the truth!" SUF ¶ 349. These are the words of a candidate speaking to his supporters—speech that is not immune from liability. *Blassingame*, 87 F.4th at 17. Moreover, this tweet is substantially similar to tweets for which summary judgment was denied. For example, the court held that tweets that similarly attacked Pence's character for refusing to challenge electors and secure Trump's reelection were unofficial (Op. 52-53): "The Vice President has the power to reject fraudulently chosen electors" (SUF ¶ 45); "All Mike Pence has to do is send them back to the States, AND WE WIN" (*id.* ¶ 47); and "If Vice President @Mike_Pence comes through for us, we will win the Presidency" (*id.* ¶ 49). These three tweets, just like the 2:24 p.m. tweet, critique Pence for failing to display "the courage" that Trump

demanded that morning; advance the same false claim that states were poised to certify a "corrected set of facts"; and conclude with the same campaign-style rhetorical flourish ("USA demands the truth!"). *See id.* ¶ 349. All four tweets address the same subject, are directed at the same audience, and relate to securing Trump's reelection. All were unofficial.

The district court avoided this conclusion by relying on two mistaken "facts" that Trump never identified, and which Plaintiffs were never given a chance to dispute. The first "fact" was that Trump "was acting (or not) on the advice of White House advisors." Op. 55; *see Lee*, Dkt. 253 at 1, 6-8. But there is no evidence of that. The Select Committee report on which the district court relied does not support the court's finding. The report indicates that Trump's advisors requested that he issue a statement to assuage violence at the Capitol. *Id.* at 54-55; *see also Lee*, Dkt. 173-24 at 595-96; Op. 77. But the report suggests that Trump drafted the tweet *before* he spoke to his advisors, and there is no evidence that they composed, edited, or reviewed the tweet before he published it. *Lee*, Dkt. 173-24 at 595-96; Op. 77. Rather, Trump excluded his advisors from the room he

was in and issued the tweet without consulting them. *Lee*, Dkt. 173-24 at 595-96; Op. 77.

Even if there were undisputed evidence that Trump "was acting (or not) on the advice of White House advisors" (Op. 55), this finding has no significance under *Blassingame*. It suggests that a President's act is more likely official if advisors were involved at all in a decision, whether the President heeded or rejected their advice. But *Blassingame* holds that an "activity" that is "organized and promoted by . . . government officials . . . is more likely an official presidential undertaking." 87 F.4th at 21. It doesn't suggest that activity that is actively discouraged by officials is official. There is no evidence that the 2:24 p.m. tweet was organized or promoted by officials.

The second "fact" relied on by the district court was that Trump was at the White House when he published the tweet. Op. 55; *Lee*, Dkt. 253 at 8-9. But this fact carries little weight. Immunity attaches to functions, not to location. *See Clinton*, 520 U.S. at 694-95*; Blassingame*, 87 F.4th at 17-19; *supra* Section I.A.1. Tweeting from the White House dining room was merely convenient: It had a

television for watching news coverage of the attack and afforded privacy for Trump's reelection calls. The tweet's White House origin cannot carry Trump's burden, especially when held up against its broader context and content.

The district court's grant of summary judgment on this tweet in favor of Trump should be reversed.

## II. The district court correctly struck the Government's Westfall Act Certification.

The district court properly struck the Government's Westfall Act certification. More than five years after Plaintiffs filed these lawsuits—and after the Government *opposed* Westfall Act certification of another defendant[11]—the Government filed notices of substitution under the Westfall Act, claiming Trump acted within the scope of his employment as to Plaintiffs' state- and common-law claims.

---

[11] *Swalwell*, Dkt. 33 at 2 (Government opposing certification request by Congressman Mo Brooks). The Government argued that Brooks engaged in campaign activity in connection with the events of January 6, 2021, noting "courts have routinely rejected claims that campaigning and electioneering activities fall within the scope of official employment." *Id.*

Certification would replace Trump with the United States as the defendant, transferring responsibility for Trump's unofficial actions—including urging a crowd to march toward the Capitol and interfere with the peaceful transition of power—to the American people. The district court correctly held that "the same activities found to be beyond the outer perimeter of President Trump's official responsibilities also fall outside the scope of his employment as President of the United States." Op. 72.

### A. The district court correctly applied D.C. respondeat superior law.

The district court properly applied District of Columbia respondeat superior law in considering the Government's Westfall Act immunity claim. Op. 71. To determine whether a federal employee acted within the scope of her employment, courts "apply the law [of] the state in which the alleged tort occurred"—here, the District of Columbia. *Phillips v. Mabus*, 894 F. Supp. 2d 71, 86 (D.D.C. 2012). To do so, D.C. applies the following "analytical framework":

> (1) Conduct of a servant is within the scope of employment if, but only if:

> (a) it is of the kind [she] is employed to perform;
>
> (b) it occurs substantially within the authorized time and space limits;
>
> (c) it is actuated, at least in part, by a purpose to serve the master, and
>
> (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
>
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

*Trump v. Carroll*, 292 A.3d 220, 228 (D.C. 2023). If Plaintiffs establish that Trump fails any element of the test, the Court must hold he wasn't acting within the scope of his employment. *Id.*[12]

The Government's brief rests on attacking a holding that the district court didn't make. The Government asserts the district court

[12] The Government asks this Court to resolve, based on out-of-circuit authority, a question this Court has never decided: Which party bears the ultimate burden of proof once a Westfall Act certification is challenged. GOB 26 n.4. The Court need not reach it. The district court, having canvassed the authority, "decide[d] in Plaintiffs' favor regardless of which side bears the ultimate burden of proof." Op. 71 n.29. The record supports this conclusion: Plaintiffs carried any burden by coming forward with evidence to rebut the certification. *See Kimbro v. Velten*, 30 F.3d 1501, 1509 (D.C. Cir. 1994); Op. 30.

"summarily reject[ed] Westfall Act immunity as co-extensive with official-act immunity." GOB 22. But the district court expressly declined to decide "whether the scope and outer-perimeter inquiries are always co-extensive when it comes to the acts of the President," observing only that "in this case, it is hard to discern any daylight between the two." Op. 73. Indeed, *Blassingame* held that an incumbent President's interest in winning reelection is "purely private." 87 F.4th at 17. Because conduct in pursuit of retaining office is not "the kind of act an incumbent President is employed to perform," it isn't within the President's scope of employment for Westfall Act purposes. Op. 74; *see Carroll*, 292 A.3d at 228.

D.C. law squarely supports this, too. D.C. law requires in every case "some relationship or nexus between the tortious conduct and the employee's responsibilities." *Carroll*, 292 A.3d at 232. The district court correctly concluded "winning re-election is not a function or outgrowth of the job of an incumbent officeholder," so "acts in furtherance of that end fall outside the scope of employment under District of Columbia law." Op. 74; *see also* Op. 72-74. The Government's own cited cases prove the point. In each case, the

employee was in the middle of performing the work he was hired to perform when committing a tort: A university dean harassed a faculty member during a faculty meeting, *Howard Univ. v. Best*, 484 A.2d 958, 986-87 (D.C. 1984); a laundromat attendant shot a customer during an argument over clothes left in a machine, *Johnson v. Weinberg*, 434 A.2d 404, 409 (D.C. 1981); and a deliveryman assaulted a customer after a dispute arising out of a delivery, *Lyon v. Carey*, 533 F.2d 649, 651-52 (D.C. Cir. 1976). Here, as the district court determined, Trump was "[c]ampaigning to *attain* [] office," not performing "an official function *of* the office." Op. 72-74 (quoting *Blassingame*). Thus, the same conduct fails both the presidential-immunity and Westfall Act tests.

The Government submits that the scope-of-employment inquiry sweeps more broadly than official-acts immunity. GOB 27-31. But the contention that presidential immunity is somehow narrower than statutory immunity available to *every federal employee* is facially absurd. As the district court observed, one would expect the opposite, because the rationale for official immunity "applies to the President with pronounced force." Op. 74 (quoting

*Blassingame*, 87 F.4th at 12). Trump himself has taken that position, describing Westfall Act immunity as "narrower than . . . absolute immunity arising directly from the Constitution." *Swalwell*, Dkt. 14-1 at 11 n.6.

The Government's support for this argument is that the Westfall Act reaches tortious and even criminal conduct. GOB 27-30. But this is a false distinction: Official-acts immunity may extend to unlawful or illegal conduct, too. *Blassingame*, 87 F.4th at 13-14. In any event, whether one doctrine sweeps more broadly than the other is irrelevant, because the Court need only decide whether either immunity applies *here*.

The Government also relies on a footnote in *Carroll* that states "the Westfall Act extended absolute immunity to the President also for non-official acts as long as they are within the scope of employment." GOB 31 (quoting *Carroll v. Trump*, 49 F.4th 759, 765 n.3 (2d Cir. 2022)). But that footnote is irrelevant here; the district court didn't hold that unofficial acts of the President are *never* entitled to Westfall Act immunity—only that Trump's conduct, on this record, isn't. Further, in *Carroll*, Trump waived the official-

acts-immunity defense, so the Second Circuit had no need to address it on the merits. *See Carroll v. Trump*, 88 F.4th 418, 429 (2d Cir. 2023). Nor did *Carroll* make rulings regarding the scope of employment under D.C. law; it instead certified that question to the D.C. Court of Appeals. 49 F.4th at 781.

### B. Each element of the scope-of-employment test independently defeats certification.

The district court also properly applied D.C. respondeat superior law, finding the conduct at issue falls "outside the scope of [Trump's] employment." Op. 72. The Government fails to identify any error in the district court's factual findings. *See supra* at 21. Nor could it. Because Trump's conduct fails under each element of the scope-of-employment test, certification fails.

**1.** *The conduct at issue wasn't of the kind Trump was employed to perform.* To qualify as conduct "of the kind" an employee is authorized to perform, it must "either [be] 'of the same general nature as' *or* 'incidental to' the conduct authorized." *Carroll*, 292 A.3d at 230. It is undisputed that campaigning to retain office isn't among a President's duties. *Blassingame*, 87 F.4th at 17. The

Government attempts to sidestep this well-settled principle by characterizing the relevant conduct at so high a level of generality that any public words spoken by a President, regardless of the actual conduct or its context, would be within his scope of employment. *See* GOB 34-35 (arguing Trump was merely "speaking to and on behalf of the American people," and "[i]t is unquestionably part of the President's job to give such speeches"). That position is untenable and has been roundly rejected. S*upra* Section I.B.2.b.

The Government's argument also distorts the scope-of-employment test, which depends on both a "nexus between the tortious conduct and the employee's responsibilities," *Carroll*, 292 A.3d at 232, and "the *context* in which the statement was made," *Council on Am.-Islamic Rels. v. Ballenger*, 444 F.3d 659, 666 (D.C. Cir. 2006) (emphasis added). The required nexus and context are absent here. *Supra* Section I.B. A private organization conceived, planned, permitted, and promoted the Rally with support from the Campaign; no public funds paid for it; nearly everyone who ran it was a former Campaign affiliate; Trump used a senior Campaign advisor, not White House officials, as his liaison to the organizers;

and Trump's speech emphasized how and why he should stay in office. *Supra* Section I.B.1. On that undisputed record, the district court correctly found that Trump's actions were not of the kind that he was employed to perform. Op. 72. The cases the Government cites, in which "the underlying conduct . . . is the type of conduct the defendants were employed to engage in," don't compel a different result. *Rasul v. Myers*, 512 F.3d 644, 658 (D.C. Cir. 2008), *vacated and remanded on other grounds*, 555 U.S. 1083 (2008), *reinstated in relevant part*, 563 F.3d 527, 528-29 (D.C. Cir. 2009); *see Wuterich*, 562 F.3d at 384 ("underlying conduct" entailed media interviews "about the pressures on American troops in the ongoing Iraq war" and was "unquestionably of the kind that [the defendant Congressman] was employed to perform"); *Wilson v. Libby*, 535 F.3d 697, 712 (D.C. Cir. 2008) (similar).

**2.** *Trump's conduct fell outside the authorized time and space limits.* The Government argues that because the Rally Speech "occurred on a weekday, during business hours, on the Ellipse with the White House as the backdrop," this element is satisfied. GOB 40. But that isn't the standard for someone like the President who

is "always on duty." *Carroll*, 292 A.3d at 233. Under those circumstances, an employer is liable for the employee only "while the employee is sufficiently engaged with their employment," rather than "attending to personal business." *Carroll*, 292 A.3d at 233. Here, as the district court found, Trump was attending to personal business as a candidate. Op. 39-43; *see Blassingame,* 87 F.4th at 4; *supra* Section I.B.

**3.** *Trump's conduct was actuated by personal purposes*. To qualify for Westfall Act immunity, conduct must be "actuated, at least in part, by a purpose to serve the master." *Carroll*, 292 A.3d at 233-34. Even if there is "some discernable purpose to serve the employer," conduct still falls outside the scope of employment if it is "too little actuated by that purpose." *Id.* at 235-36. Here, Trump acted with no discernable purpose to serve the United States. Trump's statements at the Rally "reflect an electoral purpose," and his tweets leading up to the Rally were "those of a candidate who is seeking to reverse his election fortunes." Op. 43, 53; *see supra* Sections I.B.1.e, I.C.2. Moments before taking the stage, Trump made statements that "support the reasonable inference that he

meant for his Rally Speech to be heard as 'an implicit call for imminent violence or lawlessness.'" Op. 66-67.

The Government argues that Trump's speech also addressed election integrity and legislative reform, which couldn't have impacted the 2020 election to be certified that same day. GOB 42. But certification is precisely the point—Trump's false stolen-election claims sought to halt the electoral vote count and allow him to retain office. *See, e.g.*, Op. 43; *Blassingame*, Dkt. 37 at 39-40. The district court also found that the Rally "ha[d] a 'private agenda'" that "aligned with the President's private interest as office-seeker to retain the Presidency." Op. 28-29. So, even if Trump was motivated in part by an interest in election integrity—despite the fact that multiple courts and his own Attorney General had rejected his claims of election fraud (SUF ¶¶ 102-17)—Trump's conduct was too little actuated by that purpose to satisfy this Westfall factor. *See Majano v. United States*, 469 F.3d 138, 142 (D.C. Cir. 2006).

**4.** *Trump's use of force was unexpectable*. Where "force is intentionally used by the servant against another," conduct falls

within scope only if "the use of force is not unexpectable by the master." *Carroll*, 292 A.3d at 228.

On appeal, the Government doesn't address this element and therefore forfeits any argument that Plaintiffs haven't satisfied it. *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 497 (D.C. Cir. 2004). The "riot at the Capitol on January 6" was "a decidedly unprecedented event involving the presidency." *Blassingame*, 87 F.4th at 4. It was unforeseeable that Trump—as an "employee" of the United States—would encourage and facilitate the use of violence to stop Congress from certifying the election. Trump directing force at his "master" by causing a mob to attack a coequal branch of government, attempting to thwart the will of the American people in service of his private objective of retaining office, cannot be considered expectable.

## III. The district court correctly denied Trump's motion to dismiss on First Amendment grounds.

Incitement—that is, "advocacy [] directed to inciting or producing imminent lawless action and [] likely to incite or produce such action"—isn't protected by the First Amendment.

*Brandenburg*, 395 U.S. at 447. "Incitement cases usually concern [an] effort to punish the arousal of a crowd to commit a criminal action. The root of incitement theory appears to have been grounded in concern over crowd behavior." *Herceg v. Hustler Mag., Inc.*, 814 F.2d 1017, 1023 (5th Cir. 1987). "Overthrow of the Government by force and violence" is of particular concern: "that a group aiming at its overthrow is attempting to indoctrinate its members and to commit them to a course whereby they will strike when the leaders feel the circumstances permit." *Dennis v. United States*, 341 U.S. 494, 509 (1951).

The district court correctly held that Plaintiffs plausibly alleged incitement. It explained: Trump "would have known that some in the [January 6] audience were prepared for violence," because he himself "had created an air of distrust and anger among his supporters" that had led to threats against government officials and the certification proceedings. *Blassingame*, Dkt. 37 at 93-94. "Yet, the President delivered . . . words [that] stoked an already inflamed crowd." *Id.* at 94. And he concluded by telling the crowd to stop the imminent certification by all means necessary, including

violence, directing "at the end of his remarks, 'We fight. We fight like hell and if you don't fight like hell, you're not going to have a country anymore,' moments before instructing them to march to the Capitol." *Id.*

Trump raises two principal arguments in response: (A) that incitement must be explicit and context is irrelevant; and (B) that *WRTL* requires dismissal whenever a speech admits some peaceful reading. Neither has merit. And even if the Rally Speech were protected, Trump wouldn't be entitled to dismissal.

### A. Trump's attempt to rewrite *Brandenburg* to exclude context fails.

Proof of incitement has always turned on context. Indeed, "the character of every act depends upon the circumstances in which it is done." *Schenck v. United States*, 249 U.S. 47, 52 (1919). John Stuart Mill explained that context is key to distinguishing protected speech from incitement: "An opinion that corn-dealers are starvers of the poor, or that private property is robbery, ought to be unmolested when simply circulated through the press, but may justly incur punishment when delivered orally to an excited mob assembled

before the house of a corn-dealer." John Stuart Mill, *On Liberty* 100-01 (London, John W. Parker & Son, 2d ed. 1859); *see Noto v. United States*, 367 U.S. 290, 298 (1961) (explaining that "circumstantial evidence of a call to violence now or in the future" can demonstrate incitement by "lend[ing] color to the otherwise ambiguous theoretical material").

The district court applied that principle here, explaining: "President Trump's January 6 Rally Speech was akin to telling an excited mob that corn-dealers starve the poor in front of the corn-dealer's home." *Blassingame*, Dkt. 37 at 97. "He invited his supporters to Washington, D.C., after telling them for months that corrupt and spineless politicians were to blame for stealing an election *from them*; retold that narrative when thousands of them assembled on the Ellipse; and directed them to march on the Capitol building—the metaphorical corn-dealer's house—where those very politicians were at work to certify an election that he had lost." *Id.*

As for the words of the Rally Speech, Trump contends that the district court failed to "focus[] on the language the speaker actually used." AOB 61-62. Not so. The district court explained how the

Rally Speech focused the already-volatile crowd on "radical left Democrats" and "weak Republicans," who were to blame for the "stolen" and "rigged" election, and instructed rallygoers "to walk down to the Capitol . . . to demand that Congress do the right thing and only count the electors who have been lawfully slated." *Blassingame*, Dkt. 37 at 90. And before a crowd he knew was ready for violence, he called for imminent disorder: "[Y]ou'll never take back our country with weakness. You have to show strength . . . "; "When you catch somebody in a fraud, you're allowed to go by very different rules"; "We fight like hell and if you don't fight like hell, you're not going to have a country anymore . . ."; "So let's walk down Pennsylvania Avenue." *Id.* at 90, 92, 94.

The district court rightly started, but didn't stop, its analysis with Trump's words. The Rally Speech's context speaks to both the likelihood of violence and Trump's intent—both elements of incitement. *See Brandenburg*, 395 U.S. at 447. A court cannot assess either element without examining the audience, what the speaker knew about their propensity to act, what had been said in the lead-up, and what the speaker hoped and stood to gain.

Incitement thus "inheres in particular words used in particular contexts[.]" *Counterman v. Colorado*, 600 U.S. 66, 76 (2023).[13] "[A] provocative idea" can be determined to incite a riot based on the "careful consideration of the actual circumstances surrounding such expression[.]" *Texas v. Johnson,* 491 U.S. 397, 409 (1989) (characterizing *Brandenburg* as "reviewing *circumstances surrounding* [a] rally and speeches by [the] Ku Klux Klan" (emphasis added)).

Trump identifies no case confining incitement to "explicit" advocacy. To the contrary, "[f]ederal appellate courts have understood the *Brandenburg* exception to reach implicit encouragement of violent acts." *Blassingame*, Dkt. 37 at 92. Indeed, the principal appellate decision Trump invokes holds that "speech that explicitly *or implicitly* encourages the imminent use of violence or lawless action" may be sanctioned. *Nwanguma*, 903 F.3d at 609 (emphasis added). And it requires that courts "consider the context, based on the whole record." *Id.* at 611.

[13] Trump's own motion-to-dismiss briefing asserts his "speech must be considered in context." *Lee*, Dkt. 43 at 7.

Trump attempts to confine the inclusion of implicit encouragement of violence to dicta, relying on *Bible Believers v. Wayne County*, 805 F.3d 228, 246 (6th Cir. 2015) (en banc). AOB 63. But in *Bible Believers*, the Sixth Circuit included that language in the first element of its incitement test. Nor does the result in *Nwanguma* help Trump: There, the court found no incitement because the speaker's own words—"don't hurt 'em"—as violence was beginning, undercut any call to lawbreaking. 903 F.3d at 612. Nothing comparable happened here.

Thus, the district court correctly considered the following allegations establishing that imminent violence was likely if Trump told the crowd to stop their country from being stolen at the certification—and that Trump intended as much:

- Trump spent months sowing doubt about the validity of the election, including telling his supporters "We will never let them" steal the election. *See, e.g.*, *Blassingame* Compl. ¶¶ 16-17, 21; *Lee* Compl. ¶¶ 33-34, 47; *Swalwell* Compl. ¶¶ 25, 33, 49; *Smith* Compl. ¶¶ 61-62, 73.

- Trump kept pressing the stolen-election narrative after courts across the country had rejected his fraud claims and state officials had publicly disputed them. *Smith* Compl. ¶¶ 64-71.
- Trump was aware of the threats directed against election officials and encouraged them over Twitter. *See, e.g.*, *Lee* Compl. ¶ 52; *Swalwell* Compl. ¶¶ 49-50; *Blassingame* Compl. ¶ 29; *Smith* Compl. ¶¶ 73-75.
- Trump knew prior "Stop the Steal" rallies attended by his supporters and organized militia groups (one of which he had told on television to "stand back, and stand by") had turned violent when he organized the Rally and directed supporters to "Be there, will be wild!" *Blassingame* Compl. ¶¶ 14, 22-28; *Lee* Compl. ¶¶ 30, 54-55; *Smith* Compl. ¶¶ 58-59, 77-81, 84, 87; *Swalwell* Compl. ¶ 86; *Moore* Compl. ¶¶ 16, 27-34.
- Trump's advisers actively monitored pro-Trump websites and social media with explicit calls for storming the Capitol and violence at the certification. *Lee* Compl. ¶¶ 56-64, 66; *Swalwell* Compl. ¶¶ 88-90; *Blassingame* Compl. ¶¶ 33-34; *Smith* Compl. ¶ 94.

- The violent posts were discussed "by media outlets regularly viewed by Defendant Trump, including Fox News." *Lee* Compl. ¶ 66.
- A former White House aide publicly stated, "there will be violence on January 6th because the president himself encourages it." *Id.*; *see Moore* Compl. ¶ 63.
- On the morning of January 6, Trump became "irate" that metal detectors were hindering individuals with AR-15s from joining the crowd at the Ellipse, understood "they're not here to hurt me," and ordered "Take the effing [metal detectors] away." *Garza* Compl. ¶ 71; *see Garza* Compl. ¶¶ 79, 163 (alleging that Trump knew "some of his supporters had brought weapons with them to the rally").[14]
- The crowd was shouting "Storm the Capitol," "Invade the Capitol Building," and "Take the Capitol right now," as Trump

[14] The district court considered this fact but noted that it was "outside the four corners of the complaints" on file when it addressed the issue. Op. 66 n.27. But it *is* in a later-filed complaint that has been consolidated with earlier actions and is part of this appeal. *See Garza* Compl.

spoke at the Ellipse and told them to march to the Capitol. *Lee* Compl. ¶¶ 88-89; *Smith* Compl. ¶¶ 118-20.

Trump attacks several of these allegations as false. AOB 78-80. But this appeal arises on the pleadings, where the allegations must be taken as true and inferences must be drawn in Plaintiffs' favor. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

On these allegations (and more), it's plausible that when Trump told the crowd to march to the Capitol, "show strength," and "fight like hell" using "very different rules" to stop the certification, his words were likely to cause imminent disorder and he intended that result. Op. 63-65. That is all *Brandenburg* requires at the pleading stage.

Trump next argues that the district court's approach is without precedent. It isn't. The Supreme Court engaged in the same contextual analysis in *Claiborne Hardware*—and acknowledged "implicitly" inviting violence can suffice. 458 U.S. at 927.

There, the Court held that, though the speech at issue began with an "impassioned plea for black citizens to unify, to support and respect each other," select statements about breaking the necks of

boycott violators and the sheriff's inability to protect violators could suffice as incitement. *Id.* at 902, 928. That is because, though not explicit calls to violence, those references "*implicitly* conveyed a sterner message." *Id.* at 927 (emphasis added). The reason was context: "In the passionate atmosphere in which the speeches were delivered, they might have been understood as inviting an unlawful form of discipline[.]" *Id.* Thus, "[i]f that language had been followed by acts of violence, a substantial question would be presented whether [the speaker] could be held liable[.]" *Id.* at 928. But because the remarks were—unlike here—not immediately "followed by acts of violence" the "speeches did not transcend the bounds of protected speech set forth in *Brandenburg*." *Id.*

That focus on implicit statements also defeats the States' reliance on *Claiborne*. The States' amicus brief ignores *Claiborne*'s analysis demonstrating that a few statements implicitly calling for violence can suffice even when a speech otherwise urges unity. Here, Trump used the word "peacefully" once in his 75-minute speech. *See Blassingame* Compl. ¶ 60; *Smith* Compl. ¶ 117. Under *Claiborne*, that lone statement cannot override the speech's thrust.

*Hess v. Indiana* confirms the centrality of context. 414 U.S. 105 (1973). There, one demonstrator among many said, "We'll take the fucking street later" as the sheriff passed. *Id.* at 107. The demonstrator "did not appear to be exhorting the crowd to go back into the street," "his statement did not appear to be addressed to any particular person or group," and "his tone, although loud, was no louder than that of the other people in the area." *Id.* That context undercuts any claim that he meant to cause or could cause an immediate riot. Nor was there any other "evidence or rational inference from the import of the language, that his words were intended to produce, and likely to produce, imminent disorder[.]" *Id.* at 109.

The States also misread *Hess*, arguing that the speaker there "told people *already in* a confrontation that they should engage in lawless action again." SAB 10. But as *Hess* explained, the demonstrator was one of many in the crowd, urging no one to do anything. 414 U.S. at 106-07. By contrast, Trump was a keynote speaker who summoned a crowd and urged them to take a specific, immediate action, which they then did. *See supra* at 8-9.

Trump and the States also argue that awareness that the crowd might turn violent shows at most disregard of a foreseeable risk, not intent. But the district court didn't rely on that knowledge alone, and the complaints allege far more. They allege that Trump ratified violence, including at other protests (*see Smith* Compl. ¶¶ 56-57; *Moore* Compl. ¶¶ 20, 27-35; *Tabron* Compl. ¶ 20); summoned his supporters to the Capitol on the day the election was to be certified, insisting on an unpermitted march to the certification itself (*Smith* Compl. ¶¶ 84-89); and urged the removal of metal detectors so people with AR-15s could march to the Capitol (*Garza* Compl. ¶ 71). And Trump was "delighted" by the Capitol break-in and "excited" that rioters were "pushing against Capitol Police trying to get into the building." *Blassingame* Compl. ¶ 115; *Moore* Compl. ¶ 111; *Kirkland* Compl. ¶ 105; *Tabron* Compl. ¶ 120; *see Swalwell* Compl. ¶ 7; *Garza* Compl. ¶ 6; *Smith* Compl. ¶ 154 (alleging that Trump later said of the attackers, "Personally, what I wanted is what they wanted"). These allegations go to Trump's own state of mind, not the crowd's.

Moreover, though the district court didn't (and needn't) rely on them, other allegations indicate that the crowd was shouting its desire to invade the Capitol during Trump's speech. Near the end of the speech, the crowd began chanting "Storm the Capitol," "Invade the Capitol Building," and "Take the Capitol right now!" *Smith* Compl. ¶ 118; *see Blassingame* Compl. ¶ 61; *Moore* Compl. ¶ 65; *Kirkland* Compl. ¶ 70; *Tabron* Compl. ¶ 65; *Lee* Compl. ¶ 57. Trump responded that "[w]hen you catch somebody in a fraud, you're allowed to go by very different rules," and "if you don't fight like hell, you're not going to have a country anymore." *Smith* Compl. ¶ 119. Then, he directed them to "walk down Pennsylvania Avenue" "to take back our country!" *Id.* ¶ 120. There can be no doubt that Trump intended violence when he told an armed crowd, shouting "Invade the Capitol Building," that they didn't have to follow rules and dispatched them to the Capitol for a "fight."

*Counterman* doesn't change this analysis. Trump reads it as barring evidence of intent beyond the face of a speech. AOB 66-67. That's wrong. The Court imposed a subjective-intent requirement for true threats precisely because intent is routinely provable

through circumstantial evidence. It explained, "courts and juries every day pass upon knowledge, belief and intent . . . having before them no more than evidence of . . . words *and conduct*, from which, in ordinary human experience, mental condition can be inferred." *Counterman*, 600 U.S. at 104 (Sotomayor, J., concurring in part and in the judgment) (emphasis added); *see Counterman*, 600 U.S. at 79. The same is true of incitement, which inheres in "particular contexts." *Id.* at 76. Thus, *Counterman* reaffirms that "context has long been central to the Supreme Court's incitement jurisprudence." Op. 62.

Finally, Trump stresses that no federal appellate court has sustained an implicit-incitement theory. AOB 62-63. But the Seventh Circuit held that, under *Brandenburg*, a jury could infer—based on evidence about a white supremacist website's readers and their relationship with him—that the defendant's online post with a juror's personal information "was a specific request [for violent action] to [his] followers who understood that request and were capable and willing to act on it." *United States v. White*, 610 F.3d 956, 962 (7th Cir. 2010). As that court explained, whether such

speech falls outside the First Amendment is "a dispute over the meaning and inferences that can be drawn from the facts" and not a basis for dismissal on the pleadings. *Id.* And the Colorado Supreme Court upheld an implicit-incitement theory on a record that mirrors the allegations here. *Anderson v. Griswold*, 543 P.3d 283, 340-42 (Colo. 2023), *rev'd on other grounds sub nom. Trump v. Anderson*, 601 U.S. 100 (2024).

**B. Trump's *WRTL* argument is forfeited, waived, and unfounded.**

Trump next argues that *WRTL* governs. AOB 64. Preliminarily, this Court should decline to review that argument because it was forfeited *and* waived. *Keepseagle v. Perdue*, 856 F.3d 1039, 1052-53 (D.C. Cir. 2017). Trump never asked the district court to import *WRTL*'s standard into incitement doctrine, thus forfeiting the issue.[15] And Trump intentionally relinquished the argument by making his *mens rea* a cornerstone of his defense (*see*, *e.g.*, *Lee*, Dkt.

---

[15] Seeking reconsideration, Trump cited *WRTL* only in passing—not "squarely and distinctly" as required. *Hood River Distillers, Inc. v. Nat'l Lab. Rels. Bd.*, 130 F.4th 204, 216 (D.C. Cir. 2025); *Lee*, Dkt. 145-1 at 6, 26; *Lee*, Dkt. 171 at 16.

145-1 at 5-7, 14-15, 20-21)—a position irreconcilable with *WRTL*'s rejection of intent-based reasoning. 551 U.S. at 467-70.

Even on the merits, the argument fails. *WRTL* concerned an as-applied challenge to a law that restricts corporate-funded advertisements constituting express election advocacy, or its "functional equivalent," during a preelection blackout period. 551 U.S. at 466-70. The Court held that a "functional equivalent" must be "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *Id.* at 469-70. And it cabined the test: "[K]eep in mind this test is only triggered if the speech meets the *bright-line requirements of [the law] in the first place*." *Id.* at 474 n.7 (emphasis added). Thus, *WRTL*'s blackout-period advertisement test does not apply to incitement.

And if *WRTL* applied (it doesn't), the Rally Speech would satisfy its standard: It is plausibly "susceptible of no reasonable interpretation" other than a call to disrupt the certification by force, as shown *supra* Section I.B.1.e.

**C. Even if the Rally Speech were protected, Trump wouldn't be entitled to dismissal.**

Alternatively, even if the Rally Speech were protected, Trump wouldn't be entitled to the relief he seeks. Trump appealed only the incitement holding—not the sufficiency of Plaintiffs' allegations generally. AOB 9-10. And Trump doesn't argue that any claim fails if the Rally Speech is protected. He simply assumes that, because one piece of evidence (the Speech) is protected, every claim must be dismissed.

That assumption is wrong. Rule 12(b)(6) tests the sufficiency of "*claim[s]*"—not parts of claims or specific allegations. Fed. R. Civ. P. 12(b)(6) (emphasis added). Nothing in Rule 12(b)(6) permits a court to dismiss "*parts* of claims" or factual allegations underlying claims. *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 587 (7th Cir. 2021) ("unlike a motion to dismiss, summary judgment explicitly allows for the parties to move for judgment on parts of claims to narrow . . . issues for trial"); *see also Tellabs, Inc. v. Makor Issues & Rts., Ltd.,* 551 U.S. 308, 322-23 (2007) ("The inquiry . . . is whether *all* of the facts alleged, taken collectively," are sufficient).

To obtain dismissal of every claim, Trump must show not only that his Speech wasn't incitement (which he can't do), but also that, without the Speech, each substantive claim is inadequately pleaded.

Trump hasn't done so—nor could he. Incitement isn't the only path to liability. Other "separate theories" could "justify holding" a speaker "liable for the unlawful conduct of others." *Claiborne Hardware*, 458 U.S. at 927. For instance, if, in words or conduct beyond the Speech, "he authorized, directed, or ratified specific tortious activity[,] [that] would justify holding him responsible for the consequences of that activity." *Id.* And "speeches might be taken as evidence that [a speaker] gave other specific instructions to carry out violent acts or threats." *Id.*

So while the First Amendment bars liability when "there is no evidence—apart from the [protected speech]—that [a defendant] authorized, ratified, or directly threatened acts of violence," it permits using such speech as one piece of evidence of liability. *Id.* at 929 ("If there were other evidence of his authorization of wrongful conduct, the [speech] could be used to corroborate that evidence."); *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) (First Amendment

"does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent."); *Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1083 (9th Cir. 2002) ("Speech does not become inadmissible to show context or intent simply because standing alone it is protected."); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 208 (3d Cir. 2001) (similar).

Take the Section 1985(1) conspiracy claim. *E.g.*, *Lee* Compl. ¶¶ 259-67. Plaintiffs must plausibly allege that Trump agreed to participate in a plan to prevent the certification through threats or force. *See Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). So long as *other* allegations show Trump's agreement, the Speech may "be used to corroborate" them. *Claiborne Hardware*, 458 U.S. at 929.

As the district court correctly concluded (in part of its decision not on appeal), Plaintiffs plausibly alleged that the Rally Speech was one of several ways Trump participated in a "pattern of mutually supportive activity that supports a plausible conspiracy." *Blassingame*, Dkt. 37 at 75. The complaints "detail how the

President's tweets led to threats of violence against state election officials," "how his tweet inviting supporters to Washington, D.C., on January 6th was understood by some to be a call to action," and how his supporters responded to his Rally Speech with violence at the Capitol. *Id.* The complaints also allege that Trump ratified the violence, including by tweeting shortly after law enforcement had cleared the Capitol: "These are the things and events that happen when a sacred landslide election victory is so unceremoniously & viciously stripped away from great patriots . . . . Remember this day forever!" *Id.* at 73. He again ratified the violence in a March 2021 interview, where he "said of his supporters who marched to the Capitol: 'Personally, what I wanted is what they wanted,'" and when asked about their calls to hang the Vice President, responded that it was "common sense." *Moore* Compl. ¶¶ 143-44; *Kirkland* Compl. ¶¶ 157-58; *Smith* Compl. ¶¶ 9, 154. The Rally Speech can be used to corroborate these allegations that Trump joined the conspiracy.

Because liability doesn't rest solely on allegedly protected activity, the claim cannot be dismissed. *Cf. United States v. McDermott*, 29 F.3d 404, 408 (8th Cir. 1994) (affirming conspiracy

conviction where "the jury did not base its conviction on Count I solely on the April 1 cross burning").

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's denial of Trump's summary-judgment motion on immunity grounds, striking of the Government's Westfall Act certification, and denial of Trump's motion to dismiss on First Amendment grounds. This Court should reverse the district court's grant of presidential immunity as to Trump's 2:24 p.m. tweet.

*/s/ Edward G. Caspar*
Edward G. Caspar
Jeffrey Blumberg
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street N.W., Suite 900
Washington, DC 20005
Tel: 202-662-8600
ecaspar@lawyerscommittee.org
jblumberg@lawyerscommittee.org

Faith E. Gay
Joshua S. Margolin
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000

fgay@selendygay.com
jmargolin@selendygay.com

William J. Blechman
Elizabeth B. Honkonen
SPERLING KENNY NACHWALTER
Four Seasons Tower – Suite 1100
1441 Brickell Avenue
Miami, FL 33131
Tel: 305-373-1000
wblechman@sperlingkenny.com

*Attorneys for Plaintiffs Conrad Smith, et al.*

*/s/ Joseph M. Sellers*
Joseph M. Sellers
Brian Corman
Alison S. Deich
Alisa Tiwari
Nina Jaffe-Geffner
COHEN MILSTEIN SELLERS & TOLL LLP
1100 New York Avenue N.W.
Eighth Floor Washington, D.C. 20005
Telephone: 202-408-4600
Facsimile: 202-408-4699
jsellers@cohenmilstein.com
bcorman@cohenmilstein.com
adeich@cohenmilstein.com
atiwari@cohenmilstein.com
njaffegeffner@cohenmilstein.com

Anthony P. Ashton
National Association for the
Advancement of Colored People
Office of General Counsel

4805 Mount Hope Drive
Baltimore, MD 21215
Telephone: 410-580-5777
aashton@naacpnet.org

*Attorneys for Plaintiffs Barbara J. Lee, et al.*

*/s/ Matthew Kaiser*

Matthew Kaiser
Sarah R. Fink
KAISER PLLC
1099 Fourteenth Street N.W.
8th Floor Washington, D.C. 20005
Telephone: 202-640-2850
mkaiser@kaiserlaw.com
sfink@kaiserlaw.com

*Attorneys for Plaintiff Eric Swalwell*

*/s/ Patrick A. Malone*

Patrick A. Malone
Daniel Scialpi
PATRICK MALONE & ASSOCIATES, P.C.
1310 L Street N.W. Suite 800
Washington, D.C. 20005
Telephone: 202-742-1500
Facsimile: 202-742-1515
pmalone@patrickmalonelaw.com
dscialpi@patrickmalonelaw.com

Cameron Kistler
Kristy Parker
Erica Newland
UNITED TO PROTECT DEMOCRACY
2020 Pennsylvania Avenue N.W. #163

Washington, D.C. 20006
Telephone: 202-579-4582
cameron.kistler@protectdemocracy.org
kristy.parker@protectdemocracy.org
erica.newland@protectdemocracy.org

Genevieve C. Nadeau
UNITED TO PROTECT DEMOCRACY
15 Main Street, Suite 312
Watertown, MA 02472
Telephone: 202-579-4582
genevieve.nadeau@protectdemocracy.org

*Attorneys for Plaintiffs James Blassingame and Sidney Hemby*

*/s/ Mark S. Zaid*

Mark S. Zaid, Esq.
Bradley P. Moss, Esq.
MARK S. ZAID, P.C.
1250 Connecticut Avenue N.W. Suite 700
Washington, D.C. 20036
Telephone: 202-498-0011
Facsimile: 202-330-5610
Mark@MarkZaid.com
Brad@MarkZaid.com

Matthew Kaiser
Sarah R. Fink
KAISER PLLC
1099 Fourteenth Street N.W. 8th Floor
Washington, D.C. 20005
Telephone: 202-640-2850
mkaiser@kaiserlaw.com
sfink@kaiserlaw.com

*Attorneys for Plaintiff Sandra Garza*

*/s/ Patrick A. Malone*
Patrick A. Malone
Daniel Scialpi
PATRICK MALONE & ASSOCIATES, P.C.
1310 L Street N.W. Suite 800
Washington, D.C. 20005
Telephone: 202-742-1500
Facsimile: 202-742-1515
pmalone@patrickmalonelaw.com
dscialpi@patrickmalonelaw.com

*Attorneys for Plaintiffs Marcus J. Moore et al.; Bobby Tabron et al.; and Briana Kirkland*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I hereby certify that this brief complies with the length limits, typeface, and type-style requirements of Federal Rule of Appellate Procedure 28.1, D.C. Circuit Rule 28.1(e), and this Court's order dated October 14, 2026, as it contains 19,769 words exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), and was prepared in a proportionally spaced typeface using Microsoft Word in 14-point New Century Schoolbook font.

October 16, 2026

*/s/ Edward G. Caspar*

Edward G. Caspar
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street N.W., Suite 900
Washington, DC 20005
Tel: 202-662-8600
ecaspar@lawyerscommittee.org

## CERTIFICATE OF SERVICE

I hereby certify that, on October 16, 2026, I electronically filed the foregoing document with the Clerk for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

October 16, 2026

*/s/ Edward G. Caspar*

Edward G. Caspar
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street N.W., Suite 900
Washington, DC 20005
Tel: 202-662-8600
ecaspar@lawyerscommittee.org