[ORAL ARGUMENT NOT YET SCHEDULED]
**Nos. 26-7049, 26-7052, 26-7123, 26-7154**

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

BARBARA J. LEE, *et al.*,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, solely in his personal capacity, *et al.*,

Defendants-Appellants,

UNITED STATES OF AMERICA,

Movant-Appellant

On Appeal from the United States District Court for the District of Columbia

# REPLY BRIEF FOR THE UNITED STATES

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
BRAD HINSHELWOOD
LAURA E. MYRON
*Attorneys, Appellate Staff*
*Civil Division, Room 7228*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*

## TABLE OF CONTENTS


**Page**

GLOSSARY

INTRODUCTION AND SUMMARY OF ARGUMENT ............................ 1

ARGUMENT ........................................................................... 6

THE DISTRICT COURT ERRED WHEN IT STRUCK THE UNITED STATES' WESTFALL ACT CERTIFICATION ..................... 6

A. Like The District Court, Plaintiffs Conflate The Tests For Westfall Act Immunity And Official-Acts Immunity ............. 6

B. The President Acted Within The Scope Of His Employment ............................................. 11

CONCLUSION ........................................................................ 28

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Cases:**

*Blair v. District of Columbia*,
190 A.3d 212 (D.C. 2018) ........................................................ 9

*Blassingame v. Trump*,
87 F.4th 1 (D.C. Cir. 2023) ................................................ 1-2, 3, 13, 16

*Carroll v. Trump*,
49 F.4th 759 (2d Cir. 2022) ........................................................ 10

*Council on Am. Islamic Rels. v. Ballenger*,
444 F.3d 659 (D.C. Cir. 2006) ................................................ 7, 13

*Harbury v. Hayden*,
522 F.3d 413 (D.C. Cir. 2008) ................................................ 2, 9, 10

*Jacobs v. Vrobel*,
724 F.3d 217 (D.C. Cir. 2013) ........................................................ 7

*Jamison v. Wiley*,
14 F.3d 222 (4th Cir. 1994) ........................................................ 10

*Lindke v. Freed*,
601 U.S. 187 (2024) ........................................................ 15

*In re Lindsey*,
158 F.3d 1263 (D.C. Cir. 1998) ........................................................ 17

*Majano v. United States*,
469 F.3d 138 (D.C. Cir. 2006) ........................................................ 25

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982) ................................................ 1, 6, 10

*Operation Rescue Nat'l v. United States*,
975 F. Supp. 92 (D. Mass. 1997) ........................................................ 16

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) ........................................................ 5

*Trump v. Carroll*,
292 A.3d 220 (D.C. 2023) ............. 4, 9, 10, 11, 12, 19, 20, 24-25, 26, 27

*Trump v. Hawaii*,
585 U.S. 667 (2018) ........................................................................ 24

*Trump v. Mazars USA, LLP*,
591 U.S. 848 (2020) .................................................................. 17, 18

*Trump v. United States*,
603 U.S. 593 (2024) ........................................................ 5, 12, 23, 24

*Wilson v. Libby*,
535 F.3d 697 (D.C. Cir. 2008) ..................................................... 14, 20

*Wuterich v. Murtha*,
562 F.3d 375 (D.C. Cir. 2009) ............................................................ 13

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ........................................................................ 17

**U.S. Constitution:**

U.S. Const. art. II, §§ 2-3 ................................................................ 18

**Statutes:**

28 U.S.C. § 2679 ................................................................................ 28

**Other:**

82 Fed. Reg. 22389 (May 16, 2017) ..................................................... 22

90 Fed. Reg. 14005 (Mar. 28, 2025) ..................................................... 22

Restatement (Second) of Agency § 229 (A.L.I. 1958),
Westlaw (database updated Oct. 2024) ............................................. 11

## GLOSSARY

| | |
|---|---|
| Westfall Act | Federal Employees Liability Reform and Tort Compensation Act |

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs' cursory discussion of the Westfall Act (at 76-87) adds nothing to the district court's mistaken analysis.[1] As our opening brief explained, immunity under the Westfall Act differs procedurally and substantively from official-act immunity under *Nixon v. Fitzgerald*, 457 U.S. 731 (1982). While the President's constitutional immunity is categorical, applies without regard to intent, and cannot be abrogated by Congress, it protects only his official acts. Under the Westfall Act, by contrast, immunity turns on local *respondeat superior* law, which takes into consideration much more than just the employee's official job responsibilities. Indeed, equating the two immunities makes little sense: a traditional function of *respondeat superior* law is to hold an employer liable for its employee's acts *even though* the employee acted beyond the outer perimeter of his official job responsibilities.

Plaintiffs nowhere grapple with that basic point. They repeatedly assert (*e.g.*, at 79) that President Trump acted outside the scope of his employment because, in *Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir.

---

[1] The Federal Employees Liability Reform and Tort Compensation Act of 1988 is known as the Westfall Act.

2023), this Court concluded that "office-seeker" activities are not among a President's official responsibilities. But that argument just repackages the district court's error: it substitutes the federal-law question that *Blassingame* decided (whether "office-seeker" activity constitutes an official act of a President) for the multi-factor inquiry required under D.C. *respondeat superior* principles (whether the President's conduct was within the scope of his employment for purposes of attributing tort liability to the government). As we have separately explained, the district court wrongly denied the President the benefit of his constitutional immunity under *Nixon*. *See* U.S. Opening Br. 44-53. In no event, however, does the answer to that question dictate the outcome under the Westfall Act. In fact, as plaintiffs do not dispute, both this Court and the D.C. Court of Appeals have often held that conduct far outside an employee's official job responsibilities nevertheless fell within scope under D.C. law, "including sexual harassment, a shooting, armed assault, and rape." *Harbury v. Hayden*, 522 F.3d 413, 422 (D.C. Cir. 2008).

When plaintiffs finally address the scope analysis, they insist that the President acted outside the scope of his employment because of the

"context" (Pls. Br. 83) in which he spoke. But that factor does not favor plaintiffs: the President gave a televised address about a matter of immense public importance, from the Ellipse and with the White House visible behind him, at an event the district court acknowledged was not meaningfully organized or funded by the Trump campaign. More fundamentally, plaintiffs' emphasis (at 83-84) on the logistical context for the President's speech ignores that the President is always the President of the United States. *See Blassingame*, 87 F.4th at 33 (Katsas, J., concurring) ("[T]he President is always on-duty . . . ."). Presidents frequently use privately organized events as opportunities to speak to the American public, and when doing so, the President may speak and act as the President. If a President announced at a campaign event that he was firing a cabinet secretary for having an extramarital affair, for example, that announcement would surely fall within the scope of his employment—and the President would have immunity under the Westfall Act from any subsequent defamation claim brought by the fired secretary.

Plaintiffs must show that the President's speech itself—the core conduct that plaintiffs allege was tortious—fell outside the scope of the

President's employment. On that score, however, plaintiffs have strikingly little to say. Pointing to passages of the President's speech in which he contended that he had won the election, plaintiffs reprise their mantra (at 82) that "campaigning to retain office isn't among a President's duties." But the speech contained far more than just those passages. And under D.C. law, it is not sufficient for plaintiffs to show just that the President had personal interests at stake, or even that advancing those interests were "the employee's predominant purpose." *Trump v. Carroll*, 292 A.3d 220, 235-36 (D.C. 2023). Plaintiffs must show that the President acted without any discernable interest to serve the public interest.

Plaintiffs entirely fail to carry their burden on that score. In particular, plaintiffs do not dispute that the President's speech included many traditional appeals to the public and Congress to support legislative action on topics of policy importance to the President—including proposals for future legislation that could not possibly have affected the outcome of the 2020 election or advanced the President's personal interests. *See* U.S. Opening Br. 36-39. Plaintiffs do not address those aspects of the President's speech, which are impossible to

reconcile with their legal theory. Indeed, the entire Ellipse speech—even the parts that plaintiffs highlight—reflected the President's use of the bully pulpit of his Office to encourage Americans "to act in a manner that promotes the President's view of the public good." *Trump v. United States*, 603 U.S. 593, 627 (2024). He was not precluded from expressing those views, on pain of ruinous personal tort liability, "simply because he [wa]s running for re-election." *Id.*

Neither this Court nor the Supreme Court has ever held a President personally liable for his speech to the public on a matter of public concern. As our opening brief observed (at 1), little could be more dangerous to the Framers' vision of a vigorous and energetic Chief Executive accountable to the people in regular elections. *See Seila Law LLC v. CFPB*, 591 U.S. 197, 223 (2020). Plaintiffs offer no response. Because the President's speech at the Ellipse was, at least in part, his effort to rally the public and Congress to address the President's concerns over the integrity and fairness of federal elections, the Court should hold that the President acted within the scope of his federal employment.

## ARGUMENT

## THE DISTRICT COURT ERRED WHEN IT STRUCK THE UNITED STATES' WESTFALL ACT CERTIFICATION.

Plaintiffs fail to rehabilitate the district court's order striking the Attorney General's certification under the Westfall Act. As our opening brief explained (at 24-31), the district court erred in treating Westfall Act immunity as co-extensive with official-act immunity under *Nixon v. Fitzgerald*, 457 U.S. 731 (1982). Applying the correct test, the President acted within the scope of his employment as President under D.C. *respondeat superior* law. To the extent plaintiffs meaningfully engage with our brief, their arguments lack merit.

### A. Like The District Court, Plaintiffs Conflate The Tests For Westfall Act Immunity And Official-Acts Immunity.

As an initial matter, plaintiffs repeat the error of the district court by conflating the tests for official-acts immunity and Westfall Act certification. The court mistakenly believed that its reasons for rejecting the President's immunity under *Nixon*, 457 U.S. 731, also compelled the conclusion that the President acted outside his scope of employment under D.C. *respondeat superior* law, *see* JA__ [Dkt. 219, at 71-72] (granting plaintiffs' motion to strike "largely for the reasons

already discussed"). The court thus declared that President Trump's conduct was "beyond the outer perimeter of his official responsibilities and, concomitantly, outside the scope of his employment." JA__ [Dkt. 219, at 76]. The court's conflating of the applicable tests was reversible error. *See* U.S. Opening Br. 24-31.

Plaintiffs do not seriously engage with our arguments on this score. They protest (at 78-79) that the district court did not hold the two immunities are always co-extensive but merely found them indistinguishable on the facts of this case. That is exactly the problem.

First, as we pointed out (at 25-26), the burdens rest on different parties: the President has the burden to establish official-acts immunity, but plaintiffs must bear the burden to rebut the Attorney General's scope certification under the Westfall Act. *See Jacobs v. Vrobel*, 724 F.3d 217, 220-21 (D.C. Cir. 2013); *Council on Am. Islamic Rels. v. Ballenger*, 444 F.3d 659, 662 (D.C. Cir. 2006) (per curiam). Yet at several instances in its discussion of *Nixon* immunity, the district court's summary judgment decision turned on the court's conclusion that the President had failed to produce sufficient evidence to carry his burden. *See, e.g.*, JA__ [Dkt. 219, at 22] ("These factual contentions,

individually and collectively, are not enough to carry his burden."); *see also* JA__ [Dkt. 219, at 30]; JA__ [Dkt. 219, at 39]; JA__ [Dkt. 219, at 42]; JA__ [Dkt. 219, at 48]; JA__ [Dkt. 219, at 53]; JA__ [Dkt. 219, at 55]. The court nevertheless struck the government's Westfall Act certification "largely for the reasons already discussed," JA__ [Dkt. 219, at 71-72].

Plaintiffs have nothing to say in response. They assert in a footnote (at 78 n.12), without elaboration, that they carried their evidentiary burden. But they make no effort to explain why it was appropriate for the district court to copy-and-paste its *Nixon* burden analysis into the Westfall Act context without recognizing that the burdens were reversed.

Second, plaintiffs scoff at the notion that the President's immunity under the Westfall Act could sweep more broadly, in some applications, than his constitutional immunity under *Nixon*. *See* Pls. Br. 80 (labeling this possibility "facially absurd"). But that is a natural consequence of the differences in the relevant immunity tests. To be sure, a President's constitutional immunity spans his vast and unremitting responsibilities under the Constitution and laws of the United States; it applies without

regard to intent; and it cannot be abrogated by Congress. But official-acts immunity is definitionally confined to the President's official acts. There is nothing "absurd" about the idea that the statutory immunity conferred by the Westfall Act, which turns on *respondeat superior* principles, can encompass conduct that official-act immunity does not.

Indeed, a traditional function of *respondeat superior* law is to hold an employer liable for an employee's conduct *even though* the employee may have acted beyond the outer perimeter of his official job responsibilities. In one case, for example, the D.C. Court of Appeals held that an off-duty District police officer in civilian clothing who became embroiled in a drunken brawl outside of a bar acted within the scope of his public employment. *Blair v. District of Columbia*, 190 A.3d 212, 227 (D.C. 2018); *see Trump v. Carroll*, 292 A. 3d 220, 233 (D.C. 2023) (discussing *Blair*). Other conduct held to fall within scope under D.C. law has included "sexual harassment, a shooting, armed assault, and rape." *Harbury v. Hayden*, 522 F.3d 413, 422 (D.C. Cir. 2008).

As this Court has explained, the broad reach of *respondeat superior* law reflects an intentional policy choice by the District of Columbia: "[m]any states and D.C. apply the scope-of-employment test

very expansively, in part because doing so usually allows an injured tort plaintiff a chance to recover from a deep-pocket employer rather than a judgment-proof employee." *Harbury*, 522 F.3d at 422 n.4. Congress, in turn, borrowed that intentional policy choice as the measure of statutory immunity under the Westfall Act. As a consequence, the same "very expansive[]" inquiry that governs the vicarious liability of employers under D.C. law, *id.*, also governs the statutory immunity of federal employees, including the President, from civil liability. That is why the Second Circuit correctly observed in *Carroll v. Trump* that the President could well have acted within the scope of his employment even for "non-official acts." 49 F.4th 759, 765 n.3 (2d Cir. 2022); *see also Jamison v. Wiley*, 14 F.3d 222, 227 n.2 (4th Cir. 1994).

Plaintiffs emphasize that D.C. scope-of-employment law, like official-act immunity under *Nixon*, requires at least "some relationship or nexus between the tortious conduct and the employee's responsibilities." Pls. Br. 79-80 (quoting *Carroll*, 292 A.3d at 232). While that is true, the requisite nexus is entirely different. *Nixon* immunity protects the President's official acts, regardless of his motive for taking them. *See Nixon*, 457 U.S. at 749-51. By contrast, depending

on the circumstances, the D.C. law of *respondeat superior* can subject an employer to liability—and thus, under the Westfall Act, confer immunity on the employee—even for an employee's actions that are merely "'of the same general nature as' or 'incidental to' the conduct authorized." *Carroll*, 292 A. 3d at 230 (emphasis omitted) (quoting Restatement (Second) of Agency § 229(1) (A.L.I. 1958), Westlaw (database updated Oct. 2024)); *see generally* U.S. Opening Br. 28-30. The upshot is that the Westfall Act may shield the President from liability for actions that are not within his official duties but are merely incidental to, or of the same general nature as, the expected conduct of a President.

For all of these reasons, the district court erred in concluding that, having rejected the President's *Nixon* immunity defense, it could grant plaintiffs' motion to strike the government's Westfall Act certification "largely for the reasons already discussed." JA__ [Dkt. 219, at 71-72].

### B. The President Acted Within The Scope Of His Employment.

Under the correct test, the President acted within the broad scope of his employment when he delivered his speech on January 6, 2021. The President gave a televised address to the public from the Ellipse,

with the White House behind him, about the integrity of the 2020 presidential election and the need for Congress to enact various federal legislative reforms. Such a speech, in such a setting, was plainly "of the same general nature" as those the President regularly delivers. *Carroll*, 292 A.3d at 230.

It was entirely consistent with the President's role in our constitutional tradition, moreover, for President Trump to address the public and the Congress and to urge them emphatically to support his view of what was necessary in the public interest. *Trump v. United States*, 603 U.S. 593, 627 (2024); *see* U.S. Opening Br. 32-44. The fact that the President was also seeking reelection and had a personal interest in the certification decision does not change the outcome under D.C. law.

As the parties agree, the District of Columbia considers an employee's conduct to be within the scope of his employment where "(a) it is of the kind the person is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the" employer. *Carroll*, 292 A.3d at 228 (alteration and quotation omitted). Plaintiffs bear the

burden of demonstrating that the Attorney General's certification was improper. Their response brief does not make that showing.

1. Plaintiffs first argue (at 82-83) that, under D.C. *respondeat superior* principles, the Ellipse speech was not conduct "of the kind Trump was employed to perform." In plaintiffs' view, that question begins and ends with *Blassingame*: "[i]t is undisputed that campaigning to retain office isn't among a President's duties." Pls. Br. 82 (citing *Blassingame v. Trump*, 87 F.4th 1, 17 (D.C. Cir. 2023)).

a. Here again, plaintiffs conflate the *Nixon* test with the inquiry required under D.C. law. The relevant question is *not* whether the employee acted within the outer perimeter of his actual job responsibilities. Rather, as this Court emphasized in *Ballenger*, the proper question under the first prong of the *respondeat superior* test is whether the challenged conduct is of the same general type as that for which the employee is employed. *See* 444 F.3d at 664 (framing the question as whether it was within a Member of Congress's scope of employment to speak on the phone with a reporter—not whether it was within the Member's job duties to give a defamatory statement); *see also, e.g.*, *Wuterich v. Murtha*, 562 F.3d 375, 384 (D.C. Cir. 2009);

*Wilson v. Libby*, 535 F.3d 697, 702, 712 (D.C. Cir. 2008); *see generally* U.S. Opening Br. 33-34.

As plaintiffs' own argument implicitly acknowledges (at 82-84), the focus of their tort claims is the President's speech at the Ellipse. *See* JA__ [Dkt. 219, at 57-58]. The relevant question under D.C. scope law, therefore, is whether such a televised presidential speech to the American public about the integrity of the 2020 presidential election, the need for Congress to investigate concerns over voting irregularities, and the need for broader legislative reforms to the election system in America comprises the general type of conduct that a President is employed to perform. The question answers itself.

Plaintiffs object (at 83) that framing the inquiry in these terms involves too "high a level of generality," but that is the plain import of this Court's decisions in *Wuterich*, *Wilson*, and *Ballenger*, and the D.C. cases on which those decisions rely. It is also the approach that hews most closely to *respondeat superior* principles, which are intended to identify circumstances in which an employer should in fairness be liable because its employee engaged in the general type of conduct for which he was employed and, in doing so, harmed another.

b. Plaintiffs also (at 83) point to the "context" of the President's speech: a privately funded and organized event that, although not meaningfully underwritten by the Trump campaign, *see* JA__ [Dkt. 219, at 40], nevertheless in the district court's view bore a "stronger resemblance to campaign re-election activity than an official event," JA__ [Dkt. 219, at 41]. Speaking at such an event, plaintiffs suggest, undercuts any claim that the President was acting within the scope of his federal office.[2]

Such a rigid rule would make little sense in the face of the unremitting, always-on nature of the modern Presidency. As our opening brief explained (at 35-36), Presidents often speak at private events, and they are free to take official actions when they do so. Nothing requires the President to confine his official speech or actions

---

[2] Plaintiffs have offered no defense of the district court's conclusion that the President's public statements leading up to the January 6 rally were not within the scope of his employment. Plaintiffs' argument that the Ellipse rally was a campaign event does not provide any basis to conclude that these statements—delivered via the President's Twitter account, which he routinely used for official business—were not within the scope of his employment. *Cf. Lindke v. Freed*, 601 U.S. 187, 191 (2024) (holding that a public official's speech on social media is attributable to the State if the official possesses authority to speak on the State's behalf and purported to exercise that authority when speaking).

to the Oval Office or the White House lawn. Likewise, nothing in *Blassingame* holds that everything occurring at a campaign event is necessarily private or out of scope. The President is always the President of the United States. *Cf. Blassingame*, 87 F.4th at 33 (Katsas, J., concurring) ("[T]he President is always on-duty . . . .").

As noted above, a simple example illustrates the point: if a President announced at a campaign event that he was firing a cabinet secretary for having an extramarital affair, that announcement would surely fall within the scope of his employment as President. Indeed, in *Operation Rescue*, Senator Kennedy made the allegedly defamatory remarks in a room at the Park Plaza Hotel following "a campaign fund-raising luncheon." *Operation Rescue Nat'l v. United States*, 975 F. Supp. 92, 98 (D. Mass. 1997). Nonetheless, the court held that the remarks were within the scope of his employment because he "was informing his constituents and the general public of his view on pending legislation scheduled to be considered by the Senate the next day." *Id.* at 107. Even more so than a Senator, the President is always on duty, and he may speak and act as the President in any context.

The United States does not contend that a President's private, partisan electioneering activities, lacking any plausible nexus to his responsibilities as President, fall within the scope of his employment. That principle, however, must be understood and applied with the greatest sensitivity to the complex and unremitting nature of the President's Office and role, which are not amenable to neat dichotomies. As the Supreme Court has stressed, "there is not always a clear line" between the President's "personal and official affairs." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 868 (2020); *see, e.g.*, *In re Lindsey*, 158 F.3d 1263, 1286 (D.C. Cir. 1998) (per curiam) (Tatel, J., dissenting from Part II and concurring in part and dissenting in part from Part III) (describing the line as "both elusive and difficult to discern").

That is especially so with respect to a President's speech to the public. The Constitution vests the entirety of the executive power "in a single head in whose choice the whole Nation has a part, making him the focus of public hopes and expectations." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 653 (1952) (Jackson, J., concurring in the judgment and opinion of the Court). The Framers entrusted the President with vast and unceasing public responsibilities, including

taking care that the laws are faithfully executed; commanding the Armed Forces; nominating, appointing, and removing officers; making treaties; recommending, signing, and vetoing bills; sending and receiving ambassadors; and granting pardons and reprieves. U.S. Const. art. II, §§ 2-3. And as "the only person who alone composes a branch of government," *Mazars*, 591 U.S. at 868, the President is called upon to speak and act not just for a single district or State but for all the people of the United States.

Thus, as the district court observed when considering the motion to dismiss, a "first-term President is, in a sense, always a candidate for office," and it is "not the least bit unusual for first-term Presidents to comment on public policy or foreign affairs at campaign events, or, in this day, to announce policy changes by tweet during an election year." JA__ [Dkt. 66, at 34-35]. Depending on the subject matter, the President's statements at campaign events or in tweets may readily express—and be understood by members of the public and domestic and foreign leaders as expressing—the official policy views of the President and the Executive Branch, not just the remarks of a political candidate.

Although we made these arguments in our opening brief (at 35-36), plaintiffs offer nothing in response. They do not defend the impracticality of giving dispositive weight to the logistical context in which the President takes an action or gives a speech. Nor do they actually dispute that Presidents can, and do, take official action at private events. At a minimum, giving publicly televised speeches at private events is a general *type* of activity in which Presidents commonly engage, and plaintiffs do not argue otherwise.

2. Plaintiffs likewise have little to say (at 84-85) on the question whether the President acted within the authorized time and space of his employment. As we explained, the President has no defined working hours or mandatory duty station; he is always on duty, wherever he goes and whatever the circumstances. *See* U.S. Opening Br. 40.

Plaintiffs concede that the President is "always on duty," but they contend D.C. law still treats employees who are always on duty as attending to personal business unless they are "sufficiently engaged with their employment." Pls. Br. 85 (quoting *Carroll*, 292 A.3d at 233). That contention misunderstands the precedent both of the D.C. Court of Appeals and of this Court. Plaintiffs rely on a portion of the D.C. Court

of Appeals' decision in *Carroll* addressing employees like police officers, who may be technically on call at any time but whom D.C. law generally treats as outside the scope of their employment when "off-duty, dressed in civilian clothing, and otherwise attending to personal business," such as dining at a restaurant. 292 A.3d at 233. That analysis is not particularly informative with respect to the President, who is always on duty in a different and more fundamental sense. As this Court recognized in *Wilson*, "[n]either the Vice President, his chief of staff, nor a close advisor to the President punches out of work at the end of the day or when he leaves White House property." 535 F.3d at 712 n.2. The same is even more obviously true of the President himself. And in any event, the President *was* "sufficiently engaged" with his role as President when he gave his televised address about the integrity of federal elections on the Ellipse on a weekday, during business hours, with the White House behind him.

3. Plaintiffs next contend (at 85-86) that the President acted outside the scope of his employment when giving his speech on the Ellipse because he was actuated solely by personal purposes. *See* Pls. Br. 85 ("no discernable purpose to serve the United States"). Plaintiffs

stress throughout their brief (*e.g.*, at 8) that, in portions of the Ellipse speech, the President expressed his concerns that the 2020 election had been tainted by fraud, warned his supporters the election had been "stolen," (Pls. Br. 8) and urged Congress not to certify the results without further investigation. *See, e.g.*, JA__ [Dkt. 144-47, at 3]. Denigrating these passages as examples of the President's merely "campaigning to retain office" (Pls. Br. 82), plaintiffs treat the question of motivation as essentially self-evident, devoting barely more than a page of their brief to the issue.

Plaintiffs make no effort, however, to address the portions of the President's speech that do not easily fit their "campaigning to retain office" narrative. In fact, from the beginning to the end, the President's speech emphasized themes and policy ideas that President Trump has advocated, as President, both in his first administration and in the current one. *See generally* U.S. Opening Br. 36-38, 41-43. For example, the President in his speech discussed the need for national voter identification requirements, prohibitions on ballot drop boxes, efforts to "clean up" voter rolls to ensure that all voters are American citizens, and other "sweeping election reforms." *See generally* JA__ [Dkt. 144-

47]. The President also called upon Congress to repeal Section 230, which he argued had allowed social media companies to "[s]hadow ban" conservative speakers unfairly. JA__ [Dkt. 144-47, at 19]. None of these policy proposals, even if Congress had swiftly enacted them, would have benefitted the President's reelection chances on January 6, 2021, hours before the certification. This was the President advocating for public policies he favored.

Indeed, as our opening brief noted (at 42-43), President Trump issued formal Executive Orders raising similar concerns about the integrity of federal elections and the necessity of specific reforms, such as voter ID requirements, both shortly after his first inauguration, Exec. Order No. 13,799, 82 Fed. Reg. 22389 (May 16, 2017), and again shortly after his second, *see* Exec. Order No. 14,248, 90 Fed. Reg. 14005 (Mar. 28, 2025).

Even as to the parts of the speech that plaintiffs highlight, furthermore, the President was not acting solely as a candidate for office. He was also President of the United States, in a national televised address, urging Congress to act with caution on a matter of undoubted national public importance. And as the Supreme Court has

stressed, it is always the President's prerogative to use the bully pulpit of his Office to rally the people and Congress "to act in a manner that promotes the President's view of the public good." *Trump v. United States*, 603 U.S. at 627. As we observed in our opening brief (at 38), if President Trump were to make similar remarks after the 2028 presidential election, when he will not be on the ballot, no one would doubt that those remarks expressed the President's long-held policy views about the integrity of federal elections. As noted, the district court itself acknowledged that a "first-term President is, in a sense, always a candidate for office," and that it is "not the least bit unusual for first-term Presidents to comment on public policy or foreign affairs at campaign events, or, in this day, to announce policy changes by tweet during an election year." JA__ [Dkt. 66, at 34-35]. If a speech on federal election integrity would incontrovertibly be within the scope of the President's employment for a *second*-term President, there is no reason why the same speech should be deemed out of scope for a first-term President, merely because a first-term President may have *also* had a private purpose as a candidate. Put differently, President Trump was not somehow disabled from expressing his election-integrity

concerns "simply because he [was] running for re-election." *Trump v. United States*, 603 U.S. at 627 (alteration in original) (quotation omitted); *cf. Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (in assessing a President's speech, "we must consider not only the statements of a particular President, but also the authority of the Presidency itself").

Plaintiffs ignore all of this. They do not address the policy proposals that suffused the President's speech. They do not explain how the same basic electoral-reform proposals that appeared in official Executive Orders in May 2017 and March 2025 can be fairly described as the President's "attending to personal business as a candidate." Pls. Br. 85. And they do not explain why the President should face the risk of ruinous personal liability for expressing, in 2021, the same policy views and concerns about election integrity that he has publicly spoken about repeatedly before and since.

It does not matter that the President *also* had personal electoral interests in some of what he addressed. Under D.C. law, it would not matter even if electoral considerations were the President's predominant concern in the speech, as long as the "partial purpose to serve [the] employer was more than an insignificant interest." *Carroll*,

292 A.3d at 237. Plaintiffs cite this Court's decision in *Majano v. United States*, 469 F.3d 138 (D.C. Cir. 2006), but that decision only underscores how relatively insignificant the desire to serve the employer can be. In that case, a custodial employee refused to allow a supervisor into a building without showing identification. The supervisor responded by assaulting the custodial employee and forcing her way into the building. The supervisor subsequently followed the custodial employee further into the building and committed a second violent assault. This Court held that the supervisor's initial assault of the employee and forced entry into the building were within scope because the supervisor's conduct was sufficiently "motivated, at least in part, by her desire to fulfill [her] duty" to her employer. *Id.* at 142. Even as to the second assault, the Court did not suggest that the attack was out-of-scope as a matter of law; the Court merely concluded that the jury should have had a chance to decide whether the second assault was too unrelated to the supervisor's "purpose to gain entry to the building." *Id.*

Plaintiffs also point (at 86) to the district court's findings, but the court did not find that the Ellipse speech was motivated solely by

private electoral purposes. Plaintiffs attribute to the court a finding that "the Rally 'ha[d] a "private agenda"' that 'aligned with the President's private interest as office-seeker.'" Pls. Br. 86 (alteration in original) (quoting JA__ [Dkt. 219, at 29]). In fact, in the discussion to which plaintiffs refer, the court concluded that the President had not "establish[ed] as an undisputed fact that the Rally's purpose was not to promote his re-election or advance any private agenda." JA__ [Dkt. 219, at 29] (alteration and quotation marks omitted). In other words, the President did not prove, as an undisputed fact, the *absence* of any personal motive. But that is not the President's (or the government's) burden to prove under D.C. law. As already discussed, it is plaintiffs' burden to overcome the Attorney General's certification that the President acted within the scope of his employment. To clear that bar, plaintiffs must establish that the President acted solely for himself—that is, without any significant interest to serve the public. *See Carroll*, 292 A.3d at 233. Plaintiffs have failed to make that showing.[3]

---

[3] Plaintiffs suggest in passing (Br. 76 & n.11) that the government's certification was somehow improper here because the United States previously opposed a request for certification from Congressman Mo Brooks related to his involvement in the events of January 6. At the time the United States declined that certification,

4. Finally, plaintiffs advance the curious argument (at 86-87) that the President's conduct was outside his scope of employment under D.C. law because "Trump's use of force was unexpectable." Plaintiffs point to D.C. scope principles governing cases when an employee intentionally uses force against another. In such cases, the employee's conduct is within scope "only if 'the use of force is not unexpectable by the master.'" Br. 87 (quoting *Carroll*, 292 A.3d at 228).

Those principles have nothing to do with this case. Plaintiffs do not allege that the President personally used force against anyone. Their contention is that, in the course of giving his televised address to the American public about election integrity, the President tortiously caused or induced others to commit violence. Because that claim attributes tortious wrongdoing to the President of the United States for conduct falling within the President's scope of employment, plaintiffs' exclusive remedy is a Federal Tort Claims Act claim against the United

---

however, Representative Brooks—based on his "own account of his actions at the rally" and the record at that time—had "concede[d]" that the rally was a campaign event and, more important, that his own participation was solely motivated by electioneering interests. JA__ [Dkt. 33, at 14-15 (21-cv-858)].

States, not a claim against the President personally. *See* 28 U.S.C. § 2679(d)(1).

## CONCLUSION

The district court's judgment should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
BRAD HINSHELWOOD
*/s/ Laura E. Myron*
LAURA E. MYRON
*Attorneys, Appellate Staff*
*Civil Division, Room 7228*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*

October 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) because it contains 5,300 words, excluding the items listed in Rule 32(f). This brief also complies with the typeface and type-style requirements of Rule 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Century Schoolbook, a proportionally spaced typeface.

*/s/ Laura E. Myron*
Laura E. Myron